STATE OF NORTH CAROLINA v. LARRY DOUGLAS SIMPSON

No. 193A84

(Filed 5 September 1985)

1. **Criminal Law § 75.14— confession—insufficient evidence that defendant lacked mental capacity to waive rights**

    In a prosecution for first degree sexual offense, assault with a deadly weapon with intent to kill causing serious injury, first degree kidnapping, and taking indecent liberties with a child, the trial court did not err by denying defendant's motion to suppress statements made to law enforcement authorities after his arrest where, although it seemed clear that defendant had suffered psychological problems in the past, the evidence was insufficient to establish that he was mentally incompetent at the time of the confession and there was ample evidence to support the court's conclusion that defendant knowingly and intelligently waived his constitutional rights.

2. **Criminal Law § 169— failure to adequately include excluded evidence in record —issue not preserved**

    Defendant did not preserve for appeal the issue of whether the trial court erred by refusing to permit defendant to call as witnesses to defendant's mental state the assistant district attorney and the district court judge from his initial appearance where defense counsel admitted that he did not know what the prosecutor's testimony would be, the prosecutor was in the courtroom and could have been called for an offer of proof, and statements by defense counsel as to what the judge said were inadequate to establish the essential content or substance of the judge's testimony.

**3. Attorneys at Law § 4; Criminal Law § 75.14— prosecutor and district court judge not permitted to testify regarding defendant's mental state at initial appearance — no error**

> The trial court did not err by refusing to permit defendant to call as witnesses to his mental condition the assistant district attorney and district court judge from his initial appearance where there was no showing that there were not other witnesses, such as the deputy clerk, bailiffs, and other attorneys not involved in the case, who could have testified to defendant's behavior at the initial appearance and avoided the dangers of having judges and attorneys involved in the case testify as witnesses.

> Justice BILLINGS did not participate in the consideration or decision of this case.

BEFORE *Stevens, J.,* at the 23 January 1984 Criminal Session of Superior Court, CARTERET County, defendant was convicted of first-degree sexual offense, assault with a deadly weapon with intent to kill causing serious injury, first-degree kidnapping, and indecent liberties with a child. Defendant was sentenced to the mandatory term of life imprisonment for the first-degree sexual offense conviction. The trial court consolidated the assault, kidnapping, and indecent liberties convictions and sentenced the defendant to forty years imprisonment, the sentence to commence at the expiration of the life term imposed for the first-degree sexual offense. Defendant appeals the first-degree sexual offense conviction of right pursuant to G.S. § 7A-27(a). On 29 October 1984, this Court allowed defendant's motions to bypass the Court of Appeals on his appeal in the assault, kidnapping, and indecent liberties cases. Heard in the Supreme Court 10 April 1985.

*Lacy H. Thornburg, Attorney General, by Michael Rivers Morgan, Assistant Attorney General, for the State.*

*Ann B. Petersen for defendant-appellant.*

MEYER, Justice.

Defendant raises two issues. He first argues that the trial court erred in denying his motion to suppress his custodial statements on the basis that the State failed to show that the statements were preceded by a knowing and intelligent waiver of his constitutional rights to counsel and to be free from self-incrimination. Defendant also contends that the trial court deprived him of his right to offer competent evidence in support of his defense when it denied his request to call an assistant district

attorney and a district court judge to testify as to his behavior at his initial appearance. We find no error.

The State's evidence tended to show that, in June 1983, the defendant was living in a camper trailer behind the home of Donald and Barbara Wesley in Beaufort, North Carolina. Iantha Whitaker and her husband lived across the street from the Wesleys.

On the afternoon of 10 June 1983, Mrs. Whitaker allowed her six-year-old daughter, Beverly, to ride her bicycle and play with friends and instructed her not to leave the neighborhood and to be home before dark. When Beverly failed to return within a reasonable period of time, Mrs. Whitaker went to look for her. This search was unsuccessful, and Mrs. Whitaker began to be concerned.

Connie Adams, a neighbor of the Whitakers, testified that she knew both Beverly Whitaker and the defendant. She stated that she observed Beverly riding with the defendant in his blue Chevrolet Nova between 8:00 and 8:30 p.m. on 10 June 1983. Miss Adams testified that Beverly appeared to be frightened. Miss Adams immediately went to the Whitaker home and informed Mrs. Whitaker of what she had seen. When Mrs. Whitaker went to look for her youngest son, she discovered Beverly's bicycle on the sidewalk across from the Wesleys' house. Mrs. Whitaker then notified the police.

William Mason testified that, at approximately 10:00 p.m. on 10 June 1983, he and his wife were driving along Highway 101. At that time, he saw a man standing in the middle of the road, flicking a cigarette lighter over his head. Mason stopped and the man, identified at the trial as the defendant, came over to his car and said that a little girl had been attacked with an axe. He asked Mason to call the rescue squad for assistance. Mason testified that the defendant's speech was understandable, although a bit loud and somewhat slurred. He stated that, although it appeared the defendant had been drinking, he was not drunk. He also stated that the defendant's shirt was torn, and he had what appeared to be blood on the side of his face. Mason proceeded to drive to a friend's house and called the authorities. He then returned to the scene.

Carteret County Deputy Sheriff Ron Reynolds testified that he was instructed to investigate the report. When he reached the

scene, he saw a blue Nova parked on a dirt road just off Highway 101. At that time, Reynolds observed the defendant running toward the Nova. Reynolds pulled up beside the defendant and asked what had happened. The defendant responded by merely stating, "In the car, in the car." Upon investigation of the Nova, Deputy Reynolds discovered Beverly Whitaker sitting in the passenger side of the front seat. She was naked; had severe lacerations on her right shoulder, right arm, and upper body; and was covered with blood. Reynolds immediately notified the rescue squad.

Soon Sergeant Lynn Trigleth of the Beaufort Police Department arrived on the scene. Sergeant Trigleth had received emergency medical training, and she proceeded to render first-aid treatment to the victim. Reynolds then noticed the defendant standing in a ditch next to the Nova. Reynolds escorted the defendant back to his patrol car and had him sit in the front seat. At that time, the defendant told Reynolds that several black men had attacked the victim.

Sergeant Trigleth stated that Beverly was conscious while she was giving her first-aid treatment. Trigleth testified that, in response to her inquiry as to what had occurred, Beverly stated, "Larry cut me." Trigleth informed Deputy Reynolds of Beverly's accusation. Reynolds then went back to the patrol car, handcuffed the defendant, and placed him in the back seat of the cruiser. At some point after handcuffing the defendant, Reynolds observed him banging his head against the patrol car window in an effort to get his attention. At this time, Reynolds noticed that the defendant had a stong odor of alcohol about his person. Shortly, the rescue squad arrived, and the victim was transported to Carteret General Hospital.

Dr. Peter Kuers was the surgeon on call at Carteret General Hospital the night of 10 June 1983. He testified that he treated Beverly when she was brought in and he observed severe lacerations on her right shoulder and right arm and a number of minor lacerations on her chest, neck, and abdomen. He also detected a laceration at the back of the vagina. Dr. Kuers testified that, in his opinion, the two major wounds were caused by a heavy instrument that was wider than a knife. However, he also opined that the minor cuts were too delicate to have been inflicted by a heavy weapon such as a hatchet.

Dr. George Oliver was qualified as an expert in the field of gynecology and obstetrics. He testified that, in the early morning hours of 11 June 1983, he also treated Beverly. He testified that Beverly had suffered a deep laceration of the vagina and that the laceration extended from the back of the vagina to the sphincter of the rectum. Dr. Oliver testified that, in his opinion, the vaginal laceration had been caused by the insertion of some object into Beverly's vagina.

After Beverly was transported to the hospital, Detective Frank Galizia of the Carteret County Sheriff's Department arrived at the scene and took charge of the crime scene investigation. Detective Galizia testified that after speaking with Deputy Reynolds, he got in the patrol car to talk with the defendant. The defendant began telling Galizia that he was "going to get" the black men who had attacked the girl. Galizia attempted to cut him off and advise him of his *Miranda* rights. However, the defendant immediately interrupted and began telling Galizia that the attack had been perpetrated by two black men. At that point, Detective Galizia told the defendant to stay calm and that he would talk with him later.

Galizia testified that he proceeded to examine the interior of the car. On the front seat, he discovered a pair of pink shorts and a pair of white underwear. Both items of clothing were stained with blood. Galizia also detected blood stains both in the interior and on the exterior of the car. Within two or three feet of the car, he discovered a pair of black socks, a beer can, and a bayonet.

After the investigation of the crime scene was completed, the defendant was transported to the Beaufort County Sheriff's office. The defendant was taken to an interrogation room, and Deputy Reynolds conducted a pat-down search of the defendant. Reynolds testified that a fish filet knife was discovered in the defendant's right-hand, front pants pocket and that a small pocketknife was discovered in his left-hand, front pants pocket. The handcuffs were then removed, and Reynolds gave the defendant a cup of coffee and a cigarette. Deputy Reynolds then advised the defendant of his *Miranda* rights. Reynolds testified that the defendant stated that he understood his rights and that he did not want to speak with a lawyer prior to questioning. The defendant then executed a written waiver of his rights.

Detective Galizia testified that the defendant proceeded to give a statement in which he said that, upon returning to Beaufort from Morehead City, the victim, who was playing near the Wesleys' house, asked him to take her for a ride. He stated that they got stuck on a dirt road and that two black men in an orange car pulled in behind them. The defendant said he later found the girl in a ditch. He then put her in his car and ran to the end of the road to get help. Detective Galizia indicated that he did not believe the story and told the defendant that he wanted to talk further with him about the incident.

The defendant then gave a second version of the incident in which he stated that the girl had asked him for a ride. After driving to a store to get some beer, they drove down a dirt road off Highway 101 where he and the girl had an argument. He stated that the next thing he remembered was hearing the girl screaming and that he pulled her out of some water and put her in the car. He took off her clothes to see how badly she was hurt and then ran to get help. Once again, Detective Galizia expressed doubt as to the truth of the story, and the defendant was asked to start over.

Galizia testified that the defendant than gave a third version of the incident in which he stated that he was drunk and had gotten into an argument with the girl. He then went over to the ditch to chop some wood with a hatchet that had been in the back seat. The defendant stated that the girl came over to the ditch bank and he accidentally hit her with the hatchet. According to Galizia, the defendant said that he did not know what to do and that he struck her three or four additional blows. He then undressed the victim to see if she was hurt and then went for help. Galizia told the defendant that he was concerned about the veracity of the statement. Galizia testified that he told the defendant that the statement was inconsistent with the physical evidence and "that it was time to start telling the truth." At that point, the defendant began to cry, stood up and banged his head against the interrogation room door, and indicated that he would now tell the truth.

The defendant stated that he had driven off with the girl and had, at some point, removed her clothes. He admitted putting his fingers in her "private area." He then got the hatchet and was by

the ditch cutting something when the victim came over to him. He stated that he hit her with the hatchet. He said that when he saw that she was bleeding, he stated, "Oh, God, what have I done?" and that he "must have" hit her with several additional blows. He then placed her in the car and went for help.

Detective Galizia noted that, during the questioning, the defendant was bouncing his legs up and down on the balls of his feet, but when he completed the statement, this behavior ceased and he became noticeably relaxed. The interview session lasted slightly over one hour. Later, the defendant told the authorities the location of the hatchet. The hatchet was recovered in the general vicinity of the location specified by the defendant. When found, it was covered with wet blood stains.

In response to the State's case, the defendant raised an insanity defense. The defendant's brother, James Simpson, and his landlady, Mrs. Barbara Wesley, testified concerning the background of the defendant and related specific incidents involving the defendant's behavior. The brother's testimony showed that the defendant was the third of five children and that intelligence tests administered to the defendant when he was in school indicated that he was on the low end of the intelligence scale, scoring significantly below his two older brothers. The defendant failed several grades in school and eventually dropped out. The defendant's brother testified that the defendant had few friends while growing up and was ostracized by his siblings. He further testified that the defendant exhibited bizarre behavior during his adolescent years and that he continued to demonstrate such behavior into adulthood. The defendant joined the Army, but subsequently received a medical discharge based on mental reasons. The defendant's brother testified regarding several instances of bizarre behavior on the part of the defendant after his discharge from the military. These included defendant's claim of having sex with his ex-wife at his place of employment when, in fact, she was remarried and living in another state at the time and an incident later in the same day where the defendant repeatedly threw himself into the street in front of oncoming vehicles. The defendant's landlady also testified concerning instances of unusual behavior exhibited by the defendant.

Dr. Barry Moore, a board-certified psychiatrist, testified on behalf of the defendant. Dr. Moore was appointed by the trial

court to examine the defendant and to assist defense counsel on the issue of defendant's sanity at the time of the alleged offenses. After being qualified as an expert in the field of psychiatry, Dr. Moore testified that he had examined the defendant approximately six times. Dr. Moore stated that the defendant's medical records indicated that other physicians had at previous times diagnosed the defendant as schizophrenic, depressed, or as possessing other personality disorders. Dr. Moore testified that he was of the opinion that, at the time of the incident, the defendant was laboring under defective reasoning due to mental disease or defect so as to be incapable of knowing the nature and quality of his acts.

In rebuttal, the State presented the testimony of Dr. Bob Rollins, Clinical Director of the Forensic Unit at Dorothea Dix Hospital. After being qualified and accepted as an expert in forensic psychiatry, Dr. Rollins testified that he examined the defendant on 13 June 1983, upon defendant's commitment to Dorothea Dix Hospital for a competency examination. Dr. Rollins testified that, based on his examination of the defendant and a review of the defendant's medical records, it was his opinion that the defendant was not, at the time of the incident, suffering from a mental illness which would have kept him from understanding the nature and quality of his acts.

Based on this evidence, the jury returned verdicts finding the defendant guilty of first-degree sexual offense, assault with a deadly weapon with intent to kill causing serious injury, first-degree kidnapping, and indecent liberties with a child.

[1] The defendant first assigns as error the trial court's denial of his motion to suppress any statements made by him to law enforcement authorities subsequent to his arrest. Prior to trial, a hearing was held on the defendant's suppression motion. At the hearing, Deputy Reynolds and Detective Galizia gave testimony substantially similar to their trial testimony. Dr. Moore testified at the hearing on behalf of the defendant. Dr. Moore testified that, in his opinion, the defendant was unable to comprehend his *Miranda* rights as they were then explained to him. He based this conclusion on his opinion that the defendant has difficulty thinking and comprehending under stress, a condition which would be exacerbated by the consumption of alcohol. He also noted that the

defendant is very compliant when confronted with authority figures.

Following the presentation of evidence, the trial court found that, at the time he made the statement, the defendant was not under the influence of an impairing substance, that no promises or threats were made against him, that he was read his *Miranda* rights, and that he waived these rights. Based on these and other findings, the trial court concluded that the statement was voluntarily made following a knowing and intelligent waiver of his constitutional rights.

The defendant contends that the State failed to show that his custodial statements were preceded by a knowing and intelligent waiver of his right to counsel and his right to be free from self-incrimination. We do not agree.

In *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed. 2d 694, *reh'g denied*, 385 U.S. 890, 17 L.Ed. 2d 121 (1966), the Supreme Court of the United States held that the prosecution was prohibited from using any statements resulting from a custodial interrogation of a defendant unless, prior to questioning, the defendant had been advised of his right to remain silent; that any statement may be introduced as evidence against him; that he has the right to have counsel present during questioning; and that, if he cannot afford an attorney, one will be appointed for him. The Supreme Court went on to say that a defendant may waive effectuation of these rights by a voluntary, knowing, and intelligent waiver. *Id.* at 444, 16 L.Ed. 2d at 707. *See also State v. Steptoe*, 296 N.C. 711, 252 S.E. 2d 707 (1979). Whether a waiver is knowingly and intelligently made depends on the specific facts and circumstances of each case, including the background, experience, and conduct of the accused. *Edwards v. Arizona*, 451 U.S. 477, 68 L.Ed. 2d 378, *reh'g denied*, 452 U.S. 973, 69 L.Ed. 2d 984 (1981); *see Johnson v. Zerbst*, 304 U.S. 458, 82 L.Ed. 1461 (1938). The prosecution bears the burden of demonstrating that the waiver was knowingly and intelligently made, *Miranda*, 384 U.S. 436, 16 L.Ed. 2d 694; and an express written waiver, while strong proof of the validity of the waiver, is not inevitably sufficient to establish a valid waiver. *North Carolina v. Butler*, 441 U.S. 369, 60 L.Ed. 2d 286 (1979).

The defendant argues the evidence clearly indicates that he did not possess sufficient mental capacity to execute a knowing

and intelligent waiver of his right to counsel and his right to be free from self-incrimination. In *Blackburn v. Alabama*, 361 U.S. 199, 4 L.Ed. 2d 242 (1960), the Supreme Court stated that a confession is inadmissible if the defendant was mentally incompetent at the time the statement was given. In order to ascertain whether the defendant was competent at the time of the statement, we must examine the totality of the circumstances surrounding the defendant and the confession. *State v. Ross*, 297 N.C. 137, 254 S.E. 2d 10 (1979).

The defendant points to several circumstances which he contends show that he lacked the required mental capacity for a knowing and intelligent waiver. There was evidence that the defendant possessed subnormal intelligence, that his judgment and comprehension faculties were impaired during times of stress, and that this condition could be aggravated by the consumption of alcohol. There was evidence tending to show that the defendant had consumed alcohol at some point in the evening prior to the confession. The defendant also points to the testimony of Deputy Reynolds and Detective Galizia concerning the defendant's unusual behavior at the crime scene and in the interrogation room. Finally, Dr. Moore testified that, in his opinion, the defendant was unable to comprehend his *Miranda* rights when they were explained to him.

Initially, we note that the trial court's findings of fact after a *voir dire* hearing concerning the admissibility of a confession are conclusive and binding on the appellate courts if supported by competent evidence. *State v. Corley*, 310 N.C. 40, 311 S.E. 2d 540 (1984); *State v. White*, 291 N.C. 118, 229 S.E. 2d 152 (1976). This is true even though the evidence is conflicting. *State v. Corley*, 310 N.C. 40, 311 S.E. 2d 540. The trial court's conclusions of law, however, are reviewable by the appellate courts. *Id.*

With these principles in mind, we conclude that, while it seems clear that the defendant had suffered psychological problems in the past, the evidence is insufficient to establish that he was mentally incompetent at the time of the confession. It is well established that although subnormal intelligence is a factor to be considered in determining whether a waiver is valid, this condition standing alone will not render a confession inadmissible if it is in all other respects voluntarily and understandingly made.

*State v. Jenkins*, 300 N.C. 578, 268 S.E. 2d 458 (1980). We have also said that previous incidents of mental instability are not necessarily dispositive of the issue of mental competence at the time of the confession. *State v. Vickers*, 306 N.C. 90, 291 S.E. 2d 599 (1982). Therefore, evidence of the defendant's below-average intelligence and his previous psychological problems do not compel suppression of the statement.

The defendant was found competent to stand trial following a psychiatric evaluation conducted after his arrest. In *State v. Misenheimer*, 304 N.C. 108, 282 S.E. 2d 791 (1981), we found such a finding to be significant in supporting the trial court's conclusion that the defendant's confession was knowing and voluntary. In *Misenheimer*, we also found it significant that the questioning was conducted in a well-lighted room and lasted less than two hours. Here, there was evidence that the interrogation room was well lit and that the questioning lasted one hour and ten minutes. There was also evidence that the defendant was coherent and able to move about under his own power at the time of the confession, a factor found indicative of a knowing and intelligent waiver in *State v. Vickers*, 306 N.C. 90, 291 S.E. 2d 599. Furthermore, Detective Galizia testified that the defendant was not under the influence of alcohol during the period of questioning. The trial court found that the defendant was informed of his *Miranda* rights and that he responded coherently to the questioning. We hold that, though there was evidence to the contrary, there was ample evidence to support the trial court's conclusion that the defendant fully understood his constitutional rights; that he knowingly and intelligently waived those rights; and that his statement was freely, voluntarily, and understandingly made.

The defendant next assigns as error the trial court's refusal to permit him to call as witnesses the assistant district attorney who represented the State at his initial appearance and the district court judge who presided over the initial appearance. The defendant sought to examine them concerning their observations of his behavior at that time. Since the initial appearance was conducted slightly more than forty-eight hours after the incident, the defendant argues that this testimony was material to his insanity defense. We agree that such evidence may have been material on the issue of the defendant's sanity at the time of the crimes. However, we conclude that the defendant failed to properly pre-

serve this issue for appellate review. Furthermore, assuming, *arguendo*, that the issue is before us, we find no error in the trial court's refusal to allow the defendant to call these witnesses.

[2] It is well established that an exception to the exclusion of evidence cannot be sustained where the record fails to show what the witness' testimony would have been had he been permitted to testify. *State v. Cheek*, 307 N.C. 552, 299 S.E. 2d 633 (1983); *State v. Adams*, 299 N.C. 699, 264 S.E. 2d 46 (1980); *State v. Fletcher*, 279 N.C. 85, 181 S.E. 2d 405 (1971).

In *Currence v. Harden*, 296 N.C. 95, 249 S.E. 2d 387 (1978), we held that, in order for a party to preserve for appellate review the exclusion of evidence, the significance of the excluded evidence must be made to appear in the record and a specific offer of proof is required unless the significance of the evidence is obvious from the record. We also held that the essential content or substance of the witness' testimony must be shown before we can ascertain whether prejudicial error occurred. *Id.* This standard has been applied to criminal cases. *State v. Satterfield*, 300 N.C. 621, 268 S.E. 2d 510 (1980). We have also said:

> The practice of permitting counsel to insert answers rather than have the witness give them in the presence of the court should not be encouraged. The words of the witness, and not the words counsel thinks the witness might have used, should go in the record. Ordinarily the trial judge should hear the answers. The better practice is to excuse the jury and complete the record in open court in the absence of the jury.

*State v. Willis*, 285 N.C. 195, 200, 204 S.E. 2d 33, 36 (1974). While the principles are usually cited in situations where particular testimony of a witness already on the stand is excluded, they apply with equal vigor when the witness is not permitted to testify at all.

Initially, defendant made a motion to introduce the assistant district attorney's motion to have the defendant examined to determine his competency to proceed. The motion was denied. Defendant then asked to have the assistant district attorney testify. In response to the trial court's inquiry as to what his testimony would be, defense counsel stated:

His observations, if Your Honor please, are what I'm interested in, what he observed on the 13th of June 1983 and what he saw and how the defendant appeared to him; *whether or not it would be the same as what's in the motion, Judge, I don't know.* (Emphasis added.)

The trial court then denied the request. Defense counsel subsequently stated, "Your Honor please, I would like to put in the record that we made the offer of proof, if Your Honor please." These are the only indications in the record concerning the substance of the prosecutor's proffered testimony. We hold that this is insufficient to establish the "essential content or substance" of the witness' testimony. Defense counsel himself admitted that he did not know what the prosecutor's testimony would be. Without a showing of what the excluded testimony would have been, we are unable to say that the exclusion was prejudicial. We also note that the assistant district attorney was present in the courtroom when defense counsel made the request to call him as a witness. We fail to discern any reason why defense counsel could not have made an offer of proof by having the prosecutor called to the stand in the absence of the jury and questioned about his observations of the defendant at the competency hearing.

With regard to the district court judge, the trial court again asked defense counsel what the witness would testify to. Counsel responded:

Judge, I can tell you exactly because it wasn't very long ago that I talked to him. He told me, Your Honor please, *that he has conducted, as a district attorney and as a district court judge, several hundred first appearances and he's never seen anybody like this man.* (Emphasis added.)

After the trial court denied the request to have the district court judge testify, defense counsel stated, "Your Honor please, of course I would make that offer of proof." We hold that these statements by defense counsel were inadequate to establish the essential content or substance of the judge's testimony. The statement that the judge said he had "never seen anybody" like the defendant does not show that the witness would have testified that he felt the defendant was insane or mentally ill, nor does it set out any specific instances of behavior observed by him at the

initial appearance which would aid the jury in ascertaining the defendant's mental state.

We wish to make it clear that there may be instances where a witness need not be called and questioned in order to preserve appellate review of excluded evidence. *See, e.g., State v. McCormick*, 298 N.C. 788, 259 S.E. 2d 880 (1979) (where witness answered defense counsel's question before the district attorney's objection was sustained); *Lloyd v. Babb*, 296 N.C. 416, 251 S.E. 2d 843 (1979) (where opposing counsel stipulated to the existence of the testimony which the offering party stated it would present). In the case *sub judice*, however, defense counsel's statements, apparently intended to establish the content of the excluded testimony without questioning the witnesses themselves, were not adequate to preserve the excluded evidence for judicial review.

[3] Additionally, assuming, *arguendo*, that defense counsel's efforts had constituted an adequate offer of proof for the usual witness, we find other compelling reasons to uphold the trial judge's refusal to permit the defendant to call these particular witnesses. It is generally accepted that a judge is competent to testify as to some aspects of a proceeding previously held before him. *Hale v. Wyatt*, 78 N.H. 214, 98 A. 379 (1916); *People v. Bevilacqua*, 12 Misc. 2d 558, 170 N.Y.S. 2d 423, *rev'd on other grounds*, 5 N.Y. 2d 867, 155 N.E. 2d 865, 182 N.Y.S. 2d 18 (1958). However, the propriety of calling a judge as a witness in cases not on trial before him has been questioned by many courts. Some courts have taken the position that allowing judges to testify would be prejudicial to the rights of the opposing party due to the fact that the jury would likely accord greater weight to the testimony of a judge than an ordinary witness. *E.g., Merritt v. Reserve Insurance Company*, 34 Cal. App. 3d 858, 110 Cal. Rptr. 511 (1973); *Commonwealth v. Connolly*, 217 Pa. Super. 201, 269 A. 2d 390 (1970). Other courts have viewed with trepidation the possibility that judges might be subjected to questioning as to the mental processes they employed to reach a particular decision. *E.g., State v. Donovan*, 129 N.J.L. 478, 30 A. 2d 421 (1943); *State ex rel. Carroll v. Junker*, 79 Wash. 2d 12, 482 P. 2d 775 (1971). Because of these problems, it has been held that a judge should not be called as a witness if the rights of the party can be otherwise protected. *E.g., Woodward v. City of Waterbury*, 113 Conn.

457, 155 A. 825 (1931); *State v. Donovan*, 129 N.J.L. 478, 30 A. 2d 421.

It appears well settled that a prosecutor is also competent to testify on behalf of a defendant. *People v. Boford*, 117 Cal. App. 2d 576, 256 P. 2d 334 (1953); *People v. Gendron*, 41 Ill. 2d 351, 243 N.E. 2d 208 (1968), *cert. denied*, 396 U.S. 889, 24 L.Ed. 2d 164 (1969); *State v. Stiltner*, 61 Wash. 2d 102, 377 P. 2d 252 (1962), *cert. denied*, 380 U.S. 924, 13 L.Ed. 2d 810 (1965). There is, however, a natural reluctance to allow attorneys to appear in a case as both advocate and witness. Therefore, the decision of whether to permit a defendant to call a prosecuting attorney to the stand is within the discretion of the trial court. *E.g., People v. Gendron*, 41 Ill. 2d 351, 243 N.E. 2d 208 (1968), *cert. denied*, 396 U.S. 889, 24 L.Ed. 2d 164 (1969); *State v. Tuesno*, 408 So. 2d 1269 (La. 1982); *Johnson v. State*, 23 Md. App. 131, 326 A. 2d 38 (1974). The circumstances under which a court will permit a lawyer for a party, even a prosecuting attorney, to take the witness stand must be such that a compelling reason for such action exists. *United States v. Tamura*, 694 F. 2d 591 (9th Cir. 1982); *United States v. Maloney*, 241 F. Supp. 49 (W.D. Pa. 1965). Where other witnesses are available to testify as to the information sought, the court does not abuse its discretion in refusing to allow a defendant to call the prosecutor. *State v. McClellan*, 125 Ariz. 595, 611 P. 2d 948 (App. 1980); *see State v. Tuesno*, 408 So. 2d 1269.

Guided by these principles, we conclude that the trial court did not err in refusing to permit the defendant to call these witnesses. The defendant has made no showing that the district court judge and the assistant district attorney were the only witnesses who could testify as to his behavior at the initial appearance. There were undoubtedly other persons present in the courtroom at the time of the defendant's initial appearance who may have noticed his behavior, including the deputy clerk, the bailiffs, and other attorneys not involved in the case. By calling them, the defendant could have presented evidence of his behavior at the initial appearance, while avoiding the previously cited dangers of having judges and attorneys involved in the case testify as witnesses. Absent a showing that there were no other available witnesses who could testify as to the defendant's behavior during the initial appearance, we are unable to say that

the trial court erred by refusing to permit the defendant to call these witnesses.

No error.

Justice BILLINGS did not participate in the consideration or decision of this case.