IN THE SUPREME COURT OF NORTH CAROLINA

No. 97A16

Filed 9 June 2017

STATE OF NORTH CAROLINA

v.

THOMAS DERUSSELL KNIGHT

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, ___ N.C. App. ___, 785 S.E.2d 324 (2016), finding no prejudicial error after appeal from a judgment entered on 7 February 2014 by Judge Kendra D. Hill in Superior Court, Wake County. On 9 June 2016, the Supreme Court allowed the State's petition for discretionary review of an additional issue. The case was calendared for argument in the Supreme Court on 14 February 2017, but was determined on the briefs without oral argument pursuant to N.C. R. App. P. 30(d).

*Joshua H. Stein, Attorney General, by Amy Kunstling Irene, Special Deputy Attorney General, for the State-appellee/appellant.*

*Craig M. Cooley for defendant-appellant/appellee.*

MARTIN, Chief Justice.

Defendant Thomas Knight allegedly raped and assaulted T.H., the victim, at her home in October 2012. Wearing only a shirt, T.H. eventually escaped and ran to a neighbor's house to get help. Her neighbor gave her a pair of pants to wear and called the police. Evidence that the police recovered from T.H.'s home was consistent

with her account of the events.  The police soon apprehended defendant at a nearby gas station.  When the police found defendant, he was carrying two cell phones, one of which belonged to T.H.

The police took defendant to a police station for questioning.  Detective Jeff Wenhart began questioning defendant at around 10:30 or 10:45 p.m. that evening.  In the video-recorded interrogation, which lasted under forty minutes, defendant acknowledged spending time with T.H. at her home earlier in the evening but vehemently denied having sexual relations with her and denied any wrongdoing.

I

Defendant was charged with common law robbery, assault on a female, interfering with emergency communication, second-degree rape, second-degree sexual offense, and first-degree kidnapping.  He was tried before a jury, with the Honorable Reuben F. Young presiding.  Defendant moved to suppress the custodial statements that he made to Detective Wenhart at the police station, claiming that the State had not proved that he had understood his *Miranda* rights or that he had explicitly waived them.  Judge Young granted defendant's motion and suppressed the statements.  At the close of evidence, the trial court dismissed the common law robbery charge and the interfering-with-emergency-communication charge.  The jury found defendant guilty of assault on a female but could not reach a unanimous verdict on the other three charges that remained.  As a result, the trial court sentenced

defendant for his assault-on-a-female conviction and declared a mistrial on the other three charges.

About six months later, defendant was retried before a new jury, with the Honorable Kendra D. Hill presiding, on those three charges—namely, second-degree rape, second-degree sexual offense, and first-degree kidnapping. At defendant's second trial, defendant again moved to suppress the custodial statements that he made to Detective Wenhart. Judge Hill held a voir dire hearing, heard the arguments of the parties, viewed the video recording of defendant's custodial interrogation, and ruled that defendant's custodial statements were admissible.

In the findings of fact that supported her ruling, Judge Hill noted that, when Detective Wenhart began to read defendant his *Miranda* rights and told defendant that he had a right to remain silent, "[d]efendant immediately said[,] are you arresting me?" Judge Hill also explained that, at the time, defendant "was clearly detained, and yet the reading of the rights triggered in the defendant's mind that this was an arrest, which to the [trial] [c]ourt provides some indication of knowledge" and "understanding about *Miranda* to some extent." Plus, "[c]lear language was used [by Detective Wenhart] here." "The defendant," moreover, was "an adult . . . in his 30s at the time of this" interrogation and gave "no indication to the [trial] [c]ourt" that he had "any cognitive problems." In addition, Judge Hill observed that "[d]efendant ha[d] a prior criminal history" and thus had "some knowledge and familiarity with the criminal justice system." Finally, "the discussion prior to the full reading of the

rights made it clear that the defendant was seeking information . . . and wanted to provide information with regard to his indication of what had been done here." Judge Hill concluded that the discussion "indicat[ed] a willingness for the defendant to speak to" Detective Wenhart and noted that defendant "actually sa[id] to the officer[,] I want to be frank with you, I want to explain this to you."

Based on these findings of fact, Judge Hill found, under the totality of the circumstances, that there was "enough to determine that the defendant understood his *Miranda* rights" and that, "through his continued discussion[,] . . . he voluntarily waived those rights in providing a statement to Detective Wenhart." At the close of defendant's second trial, the jury found him guilty of second-degree rape and first-degree kidnapping and not guilty of second-degree sexual offense. Defendant gave oral notice of appeal.

Before the Court of Appeals, defendant argued, among other things, that Judge Hill erred when she denied defendant's motion to suppress his custodial statements. The Court of Appeals unanimously agreed that Judge Hill had erred because the State had not shown that defendant actually understood his *Miranda* rights. *State v. Knight*, ___ N.C. App. ___, ___, ___, 785 S.E.2d 324, 333-36, 338-40 (2016); *id.* at ___, 785 S.E.2d at 340 (Stroud, J., concurring in part and dissenting in part). The Court of Appeals therefore concluded that defendant had not knowingly and intelligently waived his rights. *Id.* at ___, 785 S.E.2d at 336 (majority opinion); *id.* at ___, 785 S.E.2d at 340 (Stroud, J., concurring in part and dissenting in part). A majority of

the panel nevertheless held that Judge Hill's purported error was harmless beyond a reasonable doubt and thus found no prejudicial error in defendant's second trial. *Id.* at ___, ___, 785 S.E.2d at 336-38, 340 (majority opinion). A dissenting judge disagreed and would have granted defendant a new trial. *Id.* at ___, 785 S.E.2d at 340-41 (Stroud, J., concurring in part and dissenting in part).

Defendant appealed to this Court based on the dissenting opinion. The State filed a petition for discretionary review of an additional issue, namely, whether the Court of Appeals' ruling that defendant did not understand his *Miranda* rights and therefore did not knowingly and intelligently waive them was correct. We allowed the petition. By consent of the parties, the case was submitted for decision on the briefs under Rule 30(d) of the North Carolina Rules of Appellate Procedure.

II

The Fifth Amendment, which applies to the states through the Fourteenth Amendment, *see Griffin v. California*, 380 U.S. 609, 611, 615 (1965), provides that no person "shall be compelled in any criminal case to be a witness against himself," U.S. Const. amend. V. To protect this right, the Supreme Court of the United States has formulated a set of prophylactic warnings that criminal suspects must receive for any custodial statements that they make to be admissible in court. *See Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966). The substance of those warnings has not changed over the last fifty years. *See Berghuis v. Thompkins*, 560 U.S. 370, 380

(2010).

A defendant may, however, waive his *Miranda* rights as long as he waives them voluntarily, knowingly, and intelligently. *Miranda,* 384 U.S. at 444; *State v. Simpson,* 314 N.C. 359, 367, 334 S.E.2d 53, 59 (1985). A court's waiver inquiry has two distinct dimensions. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). First, a court must determine whether the waiver was "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* Second, a court must determine that the waiver was knowing and intelligent—that is, that it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

A waiver can be either express or implied. *See State v. Connley*, 297 N.C. 584, 586, 256 S.E.2d 234, 235-36 (order on remand) (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)), *cert. denied*, 444 U.S. 954 (1979). "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver." *Id.* at 586, 256 S.E.2d at 235 (quoting *Butler*, 441 U.S. at 373). A court may properly conclude that a defendant has waived his *Miranda* rights only if the totality of the circumstances surrounding the defendant's interrogation show both that he adequately understands them and that he was not coerced into waiving them. *Moran*, 475 U.S. at 421; *see also State v. Fincher,* 309 N.C. 1, 19, 305 S.E.2d 685, 697 (1983). Whether a defendant has knowingly and

intelligently waived his *Miranda* rights therefore "depends on the specific facts and circumstances of each case, including the [defendant's] background, experience, and conduct." *Simpson*, 314 N.C. at 367, 334 S.E.2d at 59 (citing, inter alia, *Edwards v. Arizona*, 451 U.S. 477, 482 (1981)). And although the Supreme Court has stated that the State bears a "heavy burden" in proving waiver, *Miranda*, 384 U.S. at 475, the Court later clarified that "the State need prove waiver only by a preponderance of the evidence," *Colorado v. Connelly*, 479 U.S. 157, 168 (1986), *cited in Berghuis*, 560 U.S. at 384.

More recently, in *Berghuis v. Thompkins*, the Supreme Court addressed whether a defendant who was "[l]argely silent" during a nearly three hour custodial interrogation had invoked his *Miranda* rights, and also addressed whether he had waived them. *See* 560 U.S. at 375 (brackets in original; internal quotation marks omitted); *id.* at 380-87. After receiving his *Miranda* warnings, Van Chester Thompkins, the defendant in *Berghuis*, gave only "a few limited verbal responses" to the police officers' questions, "such as 'yeah,' 'no,' or 'I don't know.'" *Id.* at 375. "About 2 hours and 45 minutes into the interrogation," one of the interrogating police officers asked Thompkins if he believed in God. *Id.* at 376. He replied, "Yes," and "his eyes welled up with tears." *Id.* (internal quotation marks and brackets omitted). The officer asked Thompkins if he prayed to God, and he replied, "Yes." *Id.* The officer then asked him if he prayed to God "to forgive [him] for shooting that boy down," and he "answered 'Yes' and looked away." *Id.*

The Court held that Thompkins had not invoked his right to remain silent under *Miranda. Id.* at 382. It ruled that a suspect must invoke his right to remain silent unambiguously, and that Thompkins had not done so. *See id.* at 381-82 (citing, inter alia, *Davis v. United States*, 512 U.S. 452, 458-62 (1994)). The Court also held that Thompkins waived his right to remain silent. *Id.* at 385, 387. It found that he had understood his *Miranda* rights, that he had engaged in a course of conduct to waive those rights, and that he had waived those rights voluntarily. *See id.* at 385-87.

With respect to the waiver issue, the Court first stated that "[t]here was more than enough evidence in the record to conclude that Thompkins understood his *Miranda* rights." *Id.* at 385. It noted that "Thompkins received a written copy of the *Miranda* warnings"; that one of the officers who interrogated Thompkins "determined that Thompkins could read and understand English"; and that "Thompkins was given time to read the warnings." *Id.* at 385-86. The Court further noted that Thompkins read one of the *Miranda* warnings aloud and that one of the officers read all of the warnings aloud. *See id.* at 386. Based on these facts, the Court said that "[t]here is no basis in this case to conclude that [Thompkins] did not understand his rights; and . . . it follows that he chose not to invoke or rely on those rights when he did speak." *Id.* at 385.

Next, the Court ruled that, by responding to the officer's questions about praying to God for forgiveness for shooting the victim, Thompkins engaged in a " 'course of conduct indicating waiver' of the right to remain silent." *Id.* at 386

(quoting *Butler*, 441 U.S. at 373). "If Thompkins wanted to remain silent," the Court explained, "he could have said nothing in response to [the officer's] questions, or he could have unambiguously invoked his *Miranda* rights and ended the interrogation." *Id.*

Finally, the Court stated that there was "no evidence that Thompkins' statement was coerced." *Id.* It noted that "Thompkins d[id] not claim that police threatened or injured him during the interrogation or that he was in any way fearful." *Id.* It also observed that, although Thompkins seemed to have been "in a straight-backed chair for three hours, . . . there is no authority for the proposition that an interrogation of this length is inherently coercive," and that even when longer interrogations had been held to be improper, the interrogations were accompanied by other coercive factors. *Id.* at 386-87. The Court held that, in these circumstances, Thompkins had "knowingly and voluntarily made a statement to police, so he waived his right to remain silent." *Id.* at 387.

### III

When a trial court makes findings of fact after a voir dire hearing concerning the admissibility of a custodial statement, those findings are conclusive and binding on the appellate courts if they are supported by competent evidence. *See Simpson*, 314 N.C. at 368, 334 S.E.2d at 59. The trial court's conclusions of law, however, are reviewed de novo. *See id.*

The case at hand gives us our first opportunity to apply *Berghuis*, and the analysis in *Berghuis* is particularly instructive here. Defendant does not allege that he invoked his right to remain silent during the custodial interrogation with Detective Wenhart. He instead argues that the State did not show, by a preponderance of the evidence, that he understood his rights. He also argues that the trial court's purported error in admitting his custodial statements was prejudicial. We do not need to reach the prejudice issue, though, because we hold that, as in *Berghuis*, defendant understood his *Miranda* rights and that, through a "course of conduct indicating waiver," *Berghuis*, 560 U.S. at 386 (quoting *Butler*, 441 U.S. at 373), he effected a knowing and voluntary waiver of them.

Here, as in *Berghuis*, defendant never said "during the interrogation . . . that he wanted to remain silent, that he did not want to talk with the police, or that he wanted an attorney." *Id.* at 375. Quite the contrary. As Judge Hill noted in her ruling on the admissibility of defendant's custodial statements, the video of defendant's interrogation—which, again, lasted under forty minutes—shows that defendant was willing to speak with Detective Wenhart. After being read his rights, defendant indicated that he wanted to tell his side of the story when he said "I'm not gonna lie to you, man" and "I'm gonna be frank with you." The video also shows that defendant talked at length during the interrogation, often interrupting Detective Wenhart, and that defendant responded without hesitation to Detective Wenhart's questions about where he had been and what he had been doing that evening. What's

more, the video shows that defendant emphatically denied any wrongdoing; provided his account of the evening's events in detail, including the fact that he had spent some time at the victim's home; and seemed to be trying to talk his way out of custody. This last point is worth emphasizing because it appears that, when faced with a choice between invoking his rights or trying to convince the police that he was innocent, defendant chose to do the latter.

Thus, defendant's course of conduct indicating waiver was much more pronounced than that of the defendant in *Berghuis*, who remained largely silent over the course of an almost three hour interrogation and who gave very limited responses when he did speak. *See id.* at 375. And yet, in *Berghuis*, the Supreme Court found that the defendant had implicitly waived his rights through his course of conduct when he answered the officer's question about whether he prayed to God for forgiveness for shooting the victim. *See id.* at 386-87. It follows that defendant in this case also made an implied waiver of his *Miranda* rights through a course of conduct that indicated waiver when he spoke, at great length, with Detective Wenhart.

In addition, as in *Berghuis*, there is no evidence here that defendant's statements were involuntary. The video of the interrogation shows that defendant was not threatened in any way and that Detective Wenhart did not make any promises, false or otherwise, to get defendant to talk. Before reading defendant his rights, Detective Wenhart simply told him that "[t]his is your opportunity, should you

so desire, . . . to tell your side of the story so that we can get to the bottom of what happened." The interrogation was conducted in what appears to be a standard interview room, and Detective Wenhart's tone throughout the interrogation was calm and conversational. And the length of Defendant's interrogation—which, as we have already noted, was less than forty minutes—was much shorter than the interrogation in *Berghuis,* which lasted almost three hours. As we have already seen, the Supreme Court noted in *Berghuis* that even interrogations *longer* than three hours have been held to be improper only when they were accompanied by other coercive factors. *Id.* at 387. Here, the only factor that one could even arguably claim was coercive was the fact that defendant's arm was handcuffed to a bar on the wall in the interrogation room. But his chair had an armrest; his arm still had an ample range of motion; and he did not appear to be in any discomfort during the interrogation. Thus, defendant voluntarily waived his *Miranda* rights.

Although he waived his *Miranda* rights through a course of conduct that indicated waiver, and although he did so voluntarily, defendant argues that the police still violated his *Miranda* rights because, he says, he did not *understand* his rights when he waived them. But under the totality of the circumstances, defendant here, like the defendant in *Berghuis*, did understand his rights.

In discussing why the defendant in *Berghuis* understood his rights, the Supreme Court noted that the defendant read and spoke English, was given a written copy of his *Miranda* rights, was informed that these rights would not dissipate after

a certain amount of time, and was told that the police would have to honor his rights, which could be asserted at any time. *Id.* at 385-86. One of the officers in *Berghuis* also read the defendant's *Miranda* rights aloud to him. *Id.* at 386.

Similarly, in this case, Detective Wenhart read all of defendant's *Miranda* rights aloud, including his right to stop answering questions at any time during the interrogation. The video of the interrogation shows that Detective Wenhart spoke clearly when he read defendant his rights, and that defendant appeared to be listening and paying attention. It is clear from the video as a whole, moreover, that defendant speaks English fluently. And defendant was certainly mature and experienced enough to understand his rights. He repeatedly told Detective Wenhart that he was "38 years old," and, as the trial court found, he had prior experience with the criminal justice system and recognized that his rights were being read to him, as evidenced by his statement that, "[i]f you're reading me my rights, I'm under arrest." In addition, as the trial court also found, defendant gave no indication that he had any cognitive problems. Nor was there anything else that would have impaired his understanding of his rights. Although defendant admitted during the interrogation that he had "been drinking" and "smoking a little pot," and claimed at one point that he was intoxicated, the video of his interrogation shows that his answers to Detective Wenhart's questions were coherent and responsive throughout.

Defendant asserts, nevertheless, that he did not understand his rights because he did not *say* that he understood them. But it is clear from *Berghuis* that the State

does not need to prove that a defendant explicitly *said* that he understood his rights; it must simply prove under the totality of the circumstances that he *in fact* understood them. In *Berghuis*, the Supreme Court stated that there was conflicting evidence as to whether Thompkins affirmatively said that he understood his *Miranda* rights, and he refused to sign an acknowledgement that he understood them. *Id.* at 375; *id.* at 399 (Sotomayor, J., dissenting). But, even though it was not clear whether Thompkins had said that he understood his rights, the Supreme Court still found that he had in fact understood them. *See id.* at 385-86 (majority opinion). In this case, then, as in *Berghuis*, "[t]here is no basis . . . to conclude that [defendant] did not understand his rights; and on these facts it follows that he chose not to invoke or rely on those rights when he did speak." *Id.* at 385.

Of course, defendant arguably indicated that he did *not* understand his rights. When asked if he understood them, he said, "I -- not really." Here is the exchange in context:

> MR. KNIGHT: See, that's the thing right there I just don't understand. What the hell am I doing in these damn cuffs, man?
> DETECTIVE: Well, if you want me to explain that, you got to allow me to get through here. Okay?
> MR. KNIGHT: I -- I'm -- listening --
> DETECTIVE: Before I ask you any questions --
> MR. KNIGHT: I'm listening (Inaudible) --
> DETECTIVE: -- You must understand your rights.
> MR. KNIGHT: You're not talking (Inaudible) --
> DETECTIVE: You have the right to remain silent and not make any statement.
> MR. KNIGHT: Like I said, I'm going to jail for no

f---ing reason.

 DETECTIVE: Anything you say can and will be used against you in court. You have the right to talk to a lawyer for advice and before I ask you any questions, and to have him or anyone else with you during questioning. If you cannot afford a lawyer, one will be appointed for you by the court before questioning, if you wish.

 If you decide to answer questions now, without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

 Do you understand each of the rights I've explained to you, Mr. Knight?

 MR. KNIGHT: I -- not really. I'm --

 DETECTIVE: Well --

 MR. KNIGHT: I'm -- I'm not gonna lie to you, man. I'm -- I'm -- I'm -- I'm serious. See, this is where I'm at now.

 DETECTIVE: Uh-huh?

 MR. KNIGHT: (Inaudible) I'm gonna be frank with you. This is exactly where I'm at. I haven't did anything wrong, man.

 DETECTIVE: Uh-huh.

 MR. KNIGHT: Not a damn thing. You see what you see. I don't care. But I haven't did any damn thing wrong. I haven't harmed anybody, I haven't did anything to anybody. All I'm trying to do is go home and lay in my damn bed so I can go to my boy's football game tomorrow morning at 9:30. That's all I'm trying to do, man.

 DETECTIVE: Okay.

 MR. KNIGHT: Other than that right there, I don't know what the hell you talking about.

 DETECTIVE: So why would this young lady say that -- that you attacked her --

 MR. KNIGHT: She's f---ing drunk. That's why.

 DETECTIVE: Were you drinking with her?

 MR. KNIGHT: Yeah, of -- yeah, we -- yeah, of course.

When viewed in its proper context, therefore, defendant's response to Detective Wenhart's question about understanding—"I -- not really. I'm--"—was a continuation of defendant's statement that he did not understand why he was in handcuffs and,

more generally, why he was being held in custody, because—in his words—he had not done "anything wrong." So the argument that defendant denied understanding his rights is not persuasive.

Even if defendant *had* been denying that he understood his rights, this bare statement, without more, would not be enough to outweigh all of the evidence of understanding that we have already discussed. The totality of the circumstances analysis might have produced a different result had defendant also asked clarifying questions or sought additional details about his right to remain silent or his right to counsel. But he did not.

In other words, the fact that a defendant affirmatively denies that he understands his rights cannot, on its own, lead to suppression. Again, while an express written or oral statement of waiver of *Miranda* rights is usually strong proof of the validity of that waiver, it is neither necessary nor sufficient to establish waiver. *Butler*, 441 U.S. at 373. Likewise, a defendant's affirmative acknowledgement that he *understands* his *Miranda* rights is neither necessary nor sufficient to establish that a defendant in fact understood them, because the test for a defendant's understanding looks to the totality of the circumstances. Just because a defendant *says* that he understands his rights, after all, does not mean that he actually understands them. By the same token, just because a defendant claims *not* to understand his rights does not necessarily mean that he does not actually understand them. In either situation, merely stating something cannot, in and of itself, establish

that the thing stated is true. That is exactly why a trial court must analyze the totality of the circumstances to determine whether a defendant in fact understood his rights. As a result, even if defendant here had denied that he understood his rights—and again, in context it appears that he did not—that would not change our conclusion in this case.

Thus, under the totality of the circumstances, the State established by a preponderance of the evidence that defendant understood his rights but knowingly and voluntarily waived them, and Judge Hill's determination was correct.

The Court of Appeals' opinion could be read to suggest that a defendant must make some sort of affirmative verbal response or affirmative gesture to acknowledge that he has understood his *Miranda* rights for his waiver to be valid. *See Knight*, ___ N.C. App. at ___, 785 S.E.2d at 335-36. That suggestion, to the extent that it exists, is explicitly disavowed. As we have shown, requiring that a defendant affirmatively acknowledge that he understands his rights in order to validly waive them conflicts with the holding in *Berghuis*.

In sum, defendant waived his *Miranda* rights during his custodial interrogation, so the statements that he made during that interrogation are admissible. Because we find no error in the trial court's decision to admit those statements, we do not need to consider whether erroneously admitting them would have been prejudicial. The remaining issues addressed by the Court of Appeals are

not before us, and we do not disturb its decision on those issues.

Although the Court of Appeals erred in finding that the admission of defendant's video-recorded interrogation violated his *Miranda* rights, it correctly upheld defendant's convictions and the judgment entered on those convictions. We therefore modify and affirm the decision of the Court of Appeals.

MODIFIED AND AFFIRMED.