CALABRIA, Judge.
*533 Defendant Thomas D. Knight ("defendant") appeals from judgment entered upon a jury verdict finding him guilty of second degree rape and first degree kidnapping. We conclude that defendant's trial was free from prejudicial error.
I. Background
In October 2012, forty-six-year-old victim T.H., a divorced mother of two adult children, resided in Fuquay-Varina. She had a boyfriend but lived alone. T.H. and defendant-who lived with his girlfriend, Leslie Leicht ("Leicht")-were neighbors and had known each other for approximately one year. Over the course of that year, T.H. and defendant "hung out" at T.H.'s home about ten to fifteen times, mainly to talk, drink alcohol, and smoke marijuana. T.H. also allowed defendant to drive her car on certain occasions. Whenever they got together, T.H. usually drank three to four beers, while defendant preferred vodka.
Although T.H. had a boyfriend and lived alone, she and defendant enjoyed a light-hearted, platonic relationship. However, defendant occasionally made sexually suggestive comments such as "once you go black you'll never go back," to which T.H. dismissively replied that she had *534 "made it this far without that so [she would] be fine." T.H. felt that defendant was "[j]ust talking junk" and she did not take his innuendos seriously. But in T.H.'s words, defendant "crossed the line" during an August 2012 incident.
On 23 August 2012, defendant came to T.H.'s home and brought her a kitten; he then "took off." Nearly an hour later, defendant suddenly entered T.H.'s home through an open back door, threw her on the bedroom floor, and positioned himself on top of her. After T.H. asked defendant "[w]hat in the fu* * " he was doing[,]" defendant answered, "[y]ou want this, Bit* *." In response, T.H. hit defendant in the face and told him to leave her home immediately, which he did. Soon after the incident, defendant texted T.H. and apologized for scaring her. He also promised that "it" would never happen again. T.H. accepted defendant's apology and got together with him two or three times between August and October of 2012.
In the late afternoon of 12 October 2012, T.H. texted defendant and asked him to get her some marijuana, something he had done for her on several prior occasions. Defendant agreed, and the two traveled to Angier in T.H.'s car to get the marijuana. After they returned to T.H.'s residence around 6:30 p.m., T.H. and defendant sat on the living room couch while drinking, getting high, watching TV, and talking about their respective relationships. During the course of the evening, defendant drank vodka straight from the bottle and T.H. consumed five beers along with two shots of vodka.
Sometime before 9:30 p.m., defendant abruptly picked T.H. up off the couch, pinned her arms against her body, and carried her to the bedroom. T.H. screamed at defendant and asked what he was doing, but he did not respond. Once in the bedroom, defendant threw T.H. on the bed, held her down, and proceeded to remove her jeans and underwear as she continued to yell and scream. After unfastening his pants, defendant vaginally penetrated T.H. for approximately ten minutes before pausing to proclaim, "now you're a real woman because you've been fu* *ed by a black man," to which T.H. replied, "well, now you have HIV." Angered by that reply and believing that he might contract AIDS, defendant ceased penetrating T.H. and began hitting her face. Defendant then put his penis in T.H.'s mouth, prompting her to bite it. Somewhat stunned, defendant backed away, which allowed T.H. to get away from defendant and run out of the home.
Wearing only a sweater, T.H. eventually made it to the home of a neighbor, Beth *329 Branham ("Branham"), who noticed blood on T.H.'s *535 lower lip. After giving T.H.-who was distraught and crying-some sweatpants to wear, Branham called the police. Several officers with the Fuquay-Varina Police Department ("FVPD") arrived at Branham's home, and T.H. told them what happened.
The officers then proceeded to T.H.'s home, where they found defendant's white t-shirt in the front yard. Inside the bedroom, the bed covers were in disarray and T.H.'s pants and panties were inside out on the floor. In addition, fresh red blood and hair that seemed to have come from T.H.'s scalp were found on the bedding.
Meanwhile, defendant had gone to a friend's house, where Leicht picked him up in her car. As the two drove home, defendant noticed police cars in the area and had Leicht drop him off at a nearby gas station. FVPD officers apprehended defendant at the gas station shortly thereafter. At that time, defendant was carrying two cell phones, one of which belonged to T.H., and he claimed to be waiting for someone to bring him money. After defendant was transported to the FVPD, Detective Jeff Wenhart questioned him regarding T.H.'s allegations. Detective Wenhart noticed scratches on defendant's nose and cheek as well as fresh blood on his shirt. A long, reddish head hair consistent with that of T.H. was found on defendant's face. During the videotaped interview, defendant acknowledged spending time with T.H. and agreeing to purchase marijuana for her on the night in question, but he denied having sex with her. He also explained that either his dog or T.H.'s cat had scratched his face and that he had recently bit his tongue, which caused the blood stain on his shirt.
On 27 November 2012, defendant was indicted on one count each of second degree forcible rape, second degree sexual offense, and first degree kidnapping. In a separate indictment, defendant was also charged with assault on a female, common law robbery, and interfering with an emergency communication.
2013 Trial
On 5 August 2013, defendant was tried in Wake County Criminal Superior Court before the Honorable Reuben F. Young. During trial, defendant moved to suppress his statement to Detective Wenhart. After viewing the videotape of defendant's interview and hearing arguments on the issue, Judge Young ruled that the questions Detective Wenhart asked violated Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and ordered that defendant's statement be suppressed. At the close of all evidence, Judge Young dismissed the charges of common *536 law robbery and interfering with an emergency communication. On 8 August 2013, the jury found defendant guilty of assault on a female, but was unable to reach a unanimous verdict as to the kidnapping, rape, and sexual assault charges, prompting Judge Young to declare a mistrial on those three charges.
2014 Trial
In February 2014, defendant was retried on the charges of second degree rape, second degree sexual offense, and first degree kidnapping in Wake County Superior Court before the Honorable Kendra D. Hill. During trial, the State revisited the issue of Judge Young's suppression ruling in the 2013 trial and argued that Judge Hill had the authority to overrule it. Judge Hill felt the issue presented a "close question[,]" but she eventually ruled that defendant's statement to Detective Wenhart was admissible. At the close of all evidence, defendant moved that the kidnapping charge be dismissed, arguing that there was insufficient evidence of "a separate ... act independent and apart from the potential two underlying felonies" (second degree rape and second degree sexual offense). Judge Hill denied the motion.
Defendant testified in his own defense as to what happened at T.H's home during the evening of 12 October 2012. According to defendant, while he and T.H. were sitting on the living room couch, T.H. leaned in and kissed him. At one point in the evening, T.H. got up to use the bathroom and, upon her return, she was wearing nothing but her sweater and underwear. T.H. asked defendant to "[c]ome here." In response, defendant resumed kissing T.H. before eventually moving her to the bedroom. Once there, defendant fell backwards onto the bed with *330 T.H. on top of him. Eventually, defendant rolled T.H. over and got on top of her, but upon his doing so, she "freaked out," hit and "flicked" him in the face, began screaming, and ran out the front door. Defendant denied having sex with T.H., and claimed that he neither removed her clothes nor attempted to put his penis in her mouth.
The jury found defendant guilty of second degree rape and first degree kidnapping, but acquitted him on the second degree sexual offense charge. Judge Hill then consolidated the two convictions, sentencing defendant to a minimum of 90 and a maximum of 168 months in the custody of the North Carolina Department of Public Safety, Division of Adult Correction. Defendant appeals.
*537 II. Analysis
A. Judge Young's Ruling
1. Law of the Case
Defendant first argues that because Judge Young suppressed defendant's videotaped statement in the 2013 trial, Judge Hill was bound by that ruling in the 2014 trial. This argument is partially premised on the law of the case doctrine.
According to the law of the case doctrine, " 'once an appellate court has ruled on a question, that decision becomes the law of the case and governs the question both in subsequent proceedings in a trial court and on subsequent appeal.' " State v. Boyd, 148 N.C.App. 304, 308, 559 S.E.2d 1, 3 (2002) (quoting Weston v. Carolina Medicorp, Inc., 113 N.C.App. 415, 417, 438 S.E.2d 751, 753 (1994) ). From the outset, we note that this legal principle does not apply here because there has been no prior appeal in this case.
Even so, another version of the doctrine, which is relevant here, provides that "when a party fails to appeal from a tribunal's decision that is not interlocutory, the decision below becomes the law of the case and cannot be challenged in subsequent proceedings in the same case." Boje v. D.W.I.T., 195 N.C.App. 118, 122, 670 S.E.2d 910, 912 (2009) (internal quotation mark omitted).
Defendant contends that once Judge Young ruled on defendant's motion to suppress, the State had the right to appeal pursuant to N.C. Gen.Stat. § 15A-979(c), which provides that "[a]n order by the superior court granting a motion to suppress prior to trial is appealable to the appellate division of the General Court of Justice prior to trial...." According to defendant, by failing to appeal the ruling, "the State waived its right to challenge [the] order and its waiver made Judge Young's suppression decision ... binding in future proceedings." Defendant also makes a separate, but related, argument[1] based on the rule "that one Superior Court judge may not correct another's errors of law; and that ordinarily one judge may not modify, overrule, or change the judgment of another Superior Court judge previously made in the same action." State v. Macon, 227 N.C.App. 152, 156, 741 S.E.2d 688, 690 (internal *538 quotations and citations omitted), review denied, 367 N.C. 238, 748 S.E.2d 545 (2013). Both arguments are without merit.
To begin, subsection 15A-979(c) applies only when a pretrial order granting a motion to suppress has been entered. Notably, the comment to section 15A-979 provides that "[t]he phrase 'prior to trial' unquestionably will be interpreted to mean prior to the attachment of jeopardy." N.C. Gen.Stat. § 15A-979 cmt. 1 (2013). Jeopardy attaches when "a competent jury has been empaneled and sworn." State v. Priddy, 115 N.C.App. 547, 550, 445 S.E.2d 610, 613 (1994). In the instant case, because Judge Young's suppression ruling was entered during defendant's 2013 trial, the State had no right to appeal it pursuant to subsection 15A-979(c). Consequently, Judge Young's ruling was not conclusive and did not become the law of the case in future proceedings.
*331 Moreover, when a defendant is retried following a mistrial, prior evidentiary rulings are not binding. State v. Harris, 198 N.C.App. 371, 376, 679 S.E.2d 464, 468 (2009). Indeed, once a mistrial has been declared, "in legal contemplation there has been no trial." State v. Sanders, 347 N.C. 587, 599, 496 S.E.2d 568, 576 (1998) (quoting State v. Tyson, 138 N.C. 627, 629, 50 S.E. 456, 456 (1905) ). "When a defendant's trial results in a hung jury and a new trial is ordered, the new trial is '[a] trial de novo, unaffected by rulings made therein during the [original] trial.' " Harris, 198 N.C.App. at 376, 679 S.E.2d at 468 (quoting Burchette v. Lynch, 139 N.C.App. 756, 760, 535 S.E.2d 77, 80 (2000) ) ("[A] 'mistrial results in nullification of a pending jury trial.' " (citation omitted)).
Here, when Judge Young declared a mistrial on the kidnapping, rape, and sexual assault charges, his ruling on defendant's motion to suppress "no longer had [any] legal effect." Id. at 376, 679 S.E.2d at 468. Indeed, the rule that one Superior Court judge may not overrule another never came into play. Accordingly, Judge Hill's discretion was not limited at defendant's retrial, and she was free to rule anew on his motion to suppress.
2. Res Judicata and Collateral Estoppel
Defendant also argues the doctrines of res judicata and collateral estoppel barred the State from re-litigating the suppression of his statement. Specifically defendant contends that, since Judge Young made factual findings to support his suppression ruling, and since the jury reached a verdict on one relevant issue, i.e., the assault on a female conviction, the admissibility of defendant's statement was conclusively determined at the 2013 trial. We disagree.
*539 First off, although defendant's brief mentions res judicata in passing, he makes no cognizable argument as to how the doctrine applies in this case. Therefore, this argument has been abandoned. N.C.R.App. P. 28(b)(6) ( "Issues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned.").
We now turn to defendant's collateral estoppel argument. "Under the doctrine of collateral estoppel, an issue of ultimate fact, once determined by a valid and final judgment, cannot again be litigated between the same parties in any future lawsuit." State v. Edwards, 310 N.C. 142, 145, 310 S.E.2d 610, 613 (1984).
Judge Young appropriately made factual findings to support his ruling on defendant's motion to suppress. But that evidentiary ruling involved a question of law based on largely undisputed facts; the admissibility of defendant's statement turned on whether he had knowingly and voluntarily waived his Miranda rights. Indeed, no issues of "ultimate fact" were determined as to the kidnapping, rape, and sexual assault charges because no "valid and final judgment" was entered on them. "[T]he doctrine of collateral estoppel applies only to an issue of ultimate fact determined by a final judgment." Macon, 227 N.C.App. at 157, 741 S.E.2d at 691. When Judge Young declared a mistrial on those charges, his ruling granting defendant's motion to suppress was vacated and had no enduring legal effect. Harris, 198 N.C.App. at 376, 679 S.E.2d at 468. Accordingly, Judge Hill was not bound by any of Judge Young's prior rulings and the doctrine of collateral estoppel is inapplicable to this case.
B. Judge Hill's Suppression Ruling at Defendant's 2014 Trial
Defendant next argues the trial court erred in denying his motion to suppress the statement he made to Detective Wenhart during a recorded interview at the FVPD. We agree, but ultimately conclude that defendant was not prejudiced by the error.
According to the interview transcript, the following exchange occurred between defendant and Detective Wenhart:
[Det. Wenhart]: Okay. As officer (Inaudible) was getting ready to explain to you-had mentioned to you, obviously, we're investigating what has been alleged as a sexual offense crime. Okay?
...
*332 This is your opportunity, should you so desire, to put your side of the story- *540 [defendant]: No-I don't-
[Det. Wenhart]:-You know, to tell your side of the story so that we can get to the bottom of what happened.
[defendant]: Man, I don't have no side-
[Det. Wenhart]: So before-before I ask you any questions you must understand your rights.
You have the right to remain silent and not make any statement.
[defendant]: So now, I'm under arrest?
[Det. Wenhart]: Anything you-well-
[defendant]: I'm under arrest.
[Det. Wenhart]: Okay.
[defendant]: If you're reading me my rights, I'm under arrest.
...
[Det. Wenhart]: [W]ell, first off, relax, because when we read somebody their rights it doesn't necessarily mean they're under arrest.
...
[Det. Wenhart]: You are in custody, hence the handcuffs.
[defendant]: Yeah. For what? For what? I-
...
Det. Wenhart: Right. Well, here's the thing, is you are detained, which means that you are in custody. It does not necessarily mean arrest, it just means in custody. And the reason you're in custody is because you have been identified, you do have some injuries that are consistent with what's went on-
[defendant]: What injuries?
...
[Det. Wenhart]: Okay. Well, you got some scratches. You got some blood on you. You got some other-so anyway. So there is some allegations of that.
*541 So this is your opportunity to tell your side of the story.
...
[defendant]: [W]hat the hell do you want me to say?
...
[Det. Wenhart]: [W]ell, we'll get to that. But you got to let me finish explaining what's going on, okay?
...
[Det. Wenhart]: This is what I have to do. I have to advise [you of] your rights. And then I'm gonna ask you some questions.
[defendant]: Man, I-
[Det. Wenhart]: Listen-listen-listen-listen-listen to me.
[defendant]: I'm intoxicated. I'm-I'm just-
[Det. Wenhart]: Mr. Knight. Mr. Knight. Mr. Knight.
[defendant]: Some bullshit, bro
....
[Det. Wenhart]: If I were taking one person at their word, would I need to sit here and talk to you and find out what-
[defendant]: Why are you even talking to me?
...
[Det. Wenhart]: Because I want your side of the story as to what happened tonight.
...
[defendant]: I have no story to tell
....
[defendant]: See, that's the thing right there I don't understand. What the hell am I doing in these damn cuffs, man?
[Det. Wenhart]: Well, if you want me to explain that, you got to allow me to get through here. Okay?
...
*542 [Det. Wenhart]: You must understand your rights.
At this point in the interrogation, Detective Wenhart Mirandized defendant. When asked if he understood each of the rights that were explained to him, defendant went on the following rant:
[defendant]: I-not really. I'm-
[Det. Wenhart]: Well-
[defendant]: I'm-I'm not gonna lie to you, man. I'm-I'm-I'm-I'm serious. See, this is where I'm at now.
[Det. Wenhart]: Uh-huh?
*333 [defendant]: (Inaudible) I'm gonna be frank with you. This is exactly where I'm at. I haven't did anything wrong, man.
[Det. Wenhart]: Uh-huh.
[defendant]: Not a damn thing. You see what you see. I don't care. But I haven't did any damn thing wrong. I haven't harmed anybody, I haven't did anything to anybody....
[Det. Wenhart]: Okay.
[defendant]: Other than that right there, I don't know what the hell you talking about.
Defendant then proceeded to answer Detective Wenhart's questions regarding, inter alia, the sexual assault under investigation, the scratches on defendant's nose and cheek, and the nature of his relationship with T.H. Throughout the interview, defendant denied having any sexual contact with T.H., stating at one point, "Bro, it never happened."
As noted above, both parties revisited issues regarding the interview's admissibility before the State called Detective Wenhart to testify at defendant's second trial. Consequently, Judge Hill conducted a voir dire hearing on defendant's motion to suppress the video. After considering the arguments of counsel and reviewing the video, the trial court determined that the central issues of contention were whether defendant understood his Miranda rights and whether his conduct during the interview established an implied waiver of those rights. In regards to those issues, the trial court made the following oral findings of fact:
*543 Defendant immediately said are you arresting me? At that time defendant was ... handcuffed to the wall, was clearly detained, and yet the reading of the rights triggered in the defendant's mind that this was an arrest, which to the Court provides some indication of [defendant's knowledge about] Miranda ....
Defendant has a prior [felony] criminal history ..., so [he has] some knowledge and familiarity with the criminal justice system.... Clear language was used here.... [D]efendant's statement was not equivocal in saying no, I do not, really in response to whether he understood his rights.... [T]he nature of the discussion prior to the full reading of the rights made it clear that ... defendant was seeking information about what had happened here and wanted to provide information with regard to ... what had been done here, indicating ... defendant['s willingness] to [talk] and actually [say] to [Detective Wenhart] I want to be frank with you, I want to explain this to you.
Judge Hill also found that defendant was an adult in his thirties with no indication of cognitive problems. Based on these findings, Judge Hill concluded as a matter of law that defendant "understood his [Miranda ] rights" and that "through his continued discussion [with law enforcement,]" he voluntarily and impliedly waived those rights in providing a statement to Detective Wenhart.
On appeal, defendant challenges the trial court's legal conclusion that he knowingly and impliedly waived his Miranda rights. The essence of this argument is that Judge Hill's findings do not support her conclusion that defendant understood his rights.
"Our review of a trial court's denial of a motion to suppress is strictly limited to determining whether the trial court's underlying findings of fact are supported by competent evidence, and whether those factual findings in turn support the trial court's ultimate conclusions of law." State v. Robinson, 221 N.C.App. 509, 517-18, 729 S.E.2d 88, 96 (2012) (citation omitted). "[T]he trial court's findings of fact after a voir dire hearing concerning the admissibility of a [defendant's custodial statement] are conclusive and binding on [this Court] if supported by competent evidence." State v. Simpson, 314 N.C. 359, 368, 334 S.E.2d 53, 59 (1985) (citations omitted). However, the trial court's legal conclusion that defendant's statement was knowingly, intelligently, and voluntarily made is fully reviewable on appeal. Id.
*544 The Fifth Amendment to the United States Constitution protects a person from being compelled to be a witness against himself in a criminal case. U.S. Const. amend. V. This privilege against self-incrimination "is made applicable to the states by the Fourteenth Amendment." State v. Richardson, 226 N.C.App. 292, 299, 741 S.E.2d 434, 440 (2013). In Miranda, the United States *334 Supreme Court decreed that statements obtained from a suspect during custodial interrogation are presumed to be compelled in violation of the Fifth Amendment's Self-Incrimination Clause and are thus inadmissible in the State's case-in-chief. 384 U.S. 436, 457-58, 86 S.Ct. 1602, 16 L.Ed.2d 694, 713-14 (1966). Under Miranda, " the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Id. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. These safeguards include warning a criminal suspect being questioned that he " has the right to remain silent, that anything he says can be used against him in a court of law, [and] that he has the right to the presence of an attorney," either retained or appointed. Id. at 479, 86 S.Ct. at 1630, 16 L.Ed.2d at 726.
"However, since Miranda's main protection lies in advising defendants of their rights[,]" Berghuis v. Thompkins, 560 U.S. 370, 385, 130 S.Ct. 2250, 2262, 176 L.Ed.2d 1098, 1113 (2010), once its procedural safeguards are properly in place, a statement is not presumptively compelled if the suspect voluntarily, knowingly, and intelligently waives his privilege against self-incrimination. State v. Simpson, 314 N.C. 359, 367, 334 S.E.2d 53, 59 (1985) ; Miranda, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 707. A valid waiver of Miranda rights involves two distinct components: the waiver (1) must be given voluntarily and (2) must be knowingly and intelligently made. Colorado v. Spring, 479 U.S. 564, 573, 107 S.Ct. 851, 856, 93 L.Ed.2d 954, 965 (1987). In assessing voluntariness, the issue is whether the defendant's statement "was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410, 421 (1986). In assessing the knowing and intelligent requirements, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id. When a suspect makes a statement after the required warnings have been given, the State bears the burden of demonstrating by a preponderance of the evidence that the suspect knowingly and intelligently waived his Fifth Amendment privilege. State v. Thibodeaux, 341 N.C. 53, 58, 459 S.E.2d 501, 505 (1995). "Whether a waiver is knowingly and intelligently made depends on the specific facts and circumstances of each case, including the background, experience, and conduct of the accused." Simpson, 314 N.C. at 367, 334 S.E.2d at 59.
*545 "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." Moran, 475 U.S. at 421, 106 S.Ct. at 1141, 89 L.Ed.2d at 421 (citations omitted) (italics added).
"To effectuate a waiver of one's Miranda rights, a suspect need not utter any particular words." Burket v. Angelone, 208 F.3d 172, 198 (4th Cir.2000) (citation omitted). A waiver can be expressly made or implied, based on the words and actions of the person interrogated. Berghuis, 560 U.S. at 384, 130 S.Ct. at 2261, 176 L.Ed.2d at 1112 ("[A] waiver of Miranda rights may be implied through" "the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver." (citation omitted)).
The voluntariness of the waiver is not at issue here. Instead, defendant argues that the State's failure to prove he understood his rights fatally undermined any waiver he may have given.
Some of the circumstances established by the evidence indicate that defendant understood and properly waived his Miranda rights. At the time of questioning, defendant was thirty-eight years old. There was nothing particularly unusual about defendant's behavior. He was alert. Defendant appeared to understand the questions posed by Detective Wenhart, and as a general matter, he responded appropriately. Even after stating he was "intoxicated," defendant responded to questioning coherently and logically. Despite aggressively contesting all charges against him, defendant never appeared confused by the questions asked. Although *335 defendant specified that he did not understand "what the hell [he] was doing in these damn cuffs," that statement was apparently made to support his proclamation of innocence. Throughout the interview, defendant was unintimidated and responsive; and he never requested that the interview be stopped.
Defendant had also been previously convicted of numerous misdemeanor charges. In terms of defendant's general awareness regarding the import of his detention, he interrupted Detective Wenhart's first attempt to Mirandize him, stating, "If you're reading my rights, I'm under arrest." Detective Wenhart then clearly explained to defendant that "when we read somebody their rights it doesn't mean they're under arrest." In most cases, these facts would support findings that defendant understood his Miranda rights, and knowingly and intelligently waived them. However, given the circumstances of this case, the aforementioned facts do not suffice.
*546 Specifically, there is no persuasive evidence that defendant actually understood his Miranda rights. Once a Miranda warning has been given and a suspect makes an uncoerced statement, "[t]he prosecution must make the additional showing that the accused understood these rights" in order to establish a valid waiver. Berghuis, 560 U.S. at 384, 130 S.Ct. at 2261, 176 L.Ed.2d at 1112. An understanding of rights and an intention to waive them, therefore, are two entirely different matters, and the former must be proven before the latter can be properly established.
We recognize that "[p]rior experience with the criminal justice system is an important factor in determining whether ... defendant made a knowing and intelligent waiver." State v. Brown, 112 N.C.App. 390, 396-97, 436 S.E.2d 163, 167 (1993). However, while defendant had been arrested many times previously, there is no direct evidence that he was Mirandized on those occasions. Even assuming defendant received Miranda warnings during prior arrests, the record contains no evidence that he demonstrated an understanding of his rights on previous occasions. Prior experience with the criminal justice system is relevant, but it is not sufficient to prove that defendant previously received Miranda warnings and understood them.
In addition, the trial court's findings that defendant had no cognitive impairment and that Detective Wenhart issued the Miranda warnings using "clear language" do not support its ruling. Just because defendant appeared to have no mental disabilities does not mean he understood the warnings expressly mandated by Miranda. As to the "clear language" finding, defendant argues "understanding your Miranda rights requires not just knowing each right individually, but knowing how the invocation of one right can impact your ability to exercise another right." To the extent defendant argues that suspects must have plenary knowledge of their Miranda rights before waiving them, he is simply wrong. "The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." Spring, 479 U.S. at 574, 107 S.Ct. at 857, 93 L.Ed.2d at 966. Even so, defendant correctly asserts that the State failed to prove he had a basic understanding of the Miranda warnings, the principal purpose of which "is to ensure that an accused is advised of and understands the right to remain silent and the right to counsel." Berghuis, 560 U.S. at 383, 130 S.Ct. at 2261, 176 L.Ed.2d at 1112. We find no indication that defendant understood he did not have to speak with Detective Wenhart, and that he could request counsel.
Finally, when asked if he understood his rights, defendant replied, "I-not really. I'm-I'm not going to lie to you, man. I'm-I'm-I'm-I'm serious. See this is where I'm at now. I'm gonna be frank with you. This *547 is exactly where I'm at. I haven't did anything wrong, man." We agree with the trial court that defendant was not indicating confusion as to his rights. Rather, taken in context, defendant's response showed that he was indignant about being hauled into the police station because, in his view, he had not done anything wrong. Nonetheless, there is no evidence that defendant ever acknowledged *336 understanding his rights. Though Detective Wenhart repeatedly stressed that defendant had to "understand [his] rights," defendant never made any kind of affirmative response to those admonitions. In order for the State to prevail on the waiver issue, little was required to demonstrate an acknowledgment of understanding. Defendants have used the colloquialism "MmMumm," Yang v. Cate, 2011 WL 3503211, at *13 (E.D.Cal.), and even a nod of the head, People v. Crane, 145 Ill.2d 520, 530, 165 Ill.Dec. 703, 707, 585 N.E.2d 99, 103 (1991), to acknowledge their rights and give intelligent waivers. The Seventh Circuit has held that a defendant's "experience and eagerness to strike a deal" with law enforcement after answering a few questions made it clear that he "understood his rights and thought he might benefit from waiving them." United States v. Brown, 664 F.3d 1115, 1118 (7th Cir.2011). And in Burket, the Fourth Circuit held that a defendant's willingness "to speak with [law enforcement], coupled with his acknowledgment that he understood his Miranda rights, constituted an implied waiver of [those] rights." 208 F.3d at 198 (emphasis added) (citing United States v. Frankson, 83 F.3d 79, 82 (4th Cir.1996) ) ("[A] defendant's subsequent willingness to answer questions after acknowledging his Miranda rights is sufficient to constitute an implied waiver." (citation and internal quotation marks omitted)). As a constitutional minimum, the State had to show that defendant intelligently relinquished a known and understood right. Patterson v. Illinois, 487 U.S. 285, 292, 108 S.Ct. 2389, 2394, 101 L.Ed.2d 261, 272 (1988). Here, defendant exhibited a willingness to answer questions after being Mirandized, but he never acknowledged his rights; nor did he engage in behavior that demonstrated a true awareness of them. As such, there is no persuasive evidence that defendant actually understood his right to remain silent and right to counsel.
All told, the "knowing and intelligent" waiver requirement implies that a choice to abandon one's rights must be based upon some appreciation of that decision's consequences. In other words, a factual understanding of the rights at issue must come together with an appreciation of the relevance of those rights in the context of an unfolding interrogation. The Constitution does not require that a suspect understand the full import of custodial interrogation, but before a waiver of rights can be intelligently made, one must understand both the basic privilege guaranteed by the Fifth Amendment and the consequences of speaking *548 freely to law enforcement officials. In the instant case, the State presented sufficient evidence of an implied waiver, but it did not show that defendant had a meaningful awareness of his Miranda rights and the consequences of waiving them. Because the State failed to make "the additional showing" by a preponderance of the evidence that defendant understood his rights, we conclude that he did not waive them intelligently. Berghuis, 560 U.S. at 384, 130 S.Ct. at 2261, 176 L.Ed.2d at 1112. Accordingly, the trial court's findings do not support its ruling that defendant gave a valid waiver of rights and the court erred by denying his motion to suppress the videotaped interview. Our decision is not based on any particular disagreement with Judge Hill as to the facts found, but on a differing legal evaluation of them.
Because the trial court's ruling infringed "upon ... defendant's constitutional rights[, the error] is presumed to be prejudicial [.]" State v. Brown, 306 N.C. 151, 164, 293 S.E.2d 569, 578 (1982). Unless the State proves the trial court's erroneous admission of defendant's custodial statement was harmless beyond a reasonable doubt, he is entitled to a new trial. Id.; N.C. Gen.Stat. § 15A-1443(b) (2013). "The test is whether, in the setting of this case, we can declare ... that there is no reasonable possibility the [erroneously admitted evidence] might have contributed to the conviction." State v. Castor, 285 N.C. 286, 292, 204 S.E.2d 848, 853 (1974). For the following reasons, the State has met its burden.
In the videotape shown to the jury, defendant never confessed to the crimes for which he was tried. Rather, he adamantly proclaimed his innocence and belligerently contested T.H.'s allegations. In State v. Council, *337 the trial court's erroneous admission of the defendant's custodial statements was found to be harmless beyond a reasonable doubt when the only "comments [he] made which could be viewed as even possibly inculpatory were: (1) wondering whether he 'might do 5 to 7' years in prison (presumably a reference to the possible consequences of his arrest), (2) an admission that he had seen and narrowly avoided police officers the night before, (3) an expression that he had intended to stay 'on the run' as long as possible, and (4) a question about why police had described him as 'armed and dangerous.' " 232 N.C.App. 68, 79, 753 S.E.2d 223, 231, review denied, 367 N.C. 505, 759 S.E.2d 101 (2014). Similarly here, our review of the video and transcript of defendant's statement reveals few, if any, comments that could be viewed as inculpatory. If the defendant's statement in Council -which included references to potential jail time and staying "on the run"-was not particularly prejudicial, the same holds true for defendant's statement in this case. *549 Moreover, there was overwhelming evidence of defendant's guilt on the rape charge. In addition to T.H.'s detailed testimony, the State presented evidence of prior statements T.H. made to police officers and a sexual assault nurse examiner shortly after the incident with defendant occurred. When he was arrested, defendant had T.H.'s cell phone in his possession and he lied to law enforcement regarding the reason he was at the gas station. Defendant had scratches on his nose and cheek, fresh blood on his shirt, and a strand of hair consistent with the color of T.H.'s head hair on his cheek. When officers entered T.H.'s home to investigate, they found her bed covers in disarray, and her pants and panties were inside out on the bedroom floor. Subsequent chemical testing revealed the presence of defendant's DNA on T.H.'s panties, bed sheet, and comforter. Significantly, while being detained in Wake County jail, defendant made several phone calls to Leicht and another to Ryan Knight ("Ryan") in which he gave conflicting accounts about what happened with T.H. Defendant told Leicht the charges against him were "bullsh* *." However, in his conversation with Ryan, defendant stated that T.H was "fu* *ing" with him all night; he thought she was going to give him some "pu* *y[;]" and he was getting ready to put his " d* *k" in her when she decided to holler rape, prompting defendant to "let the b* *ch go."
Despite the foregoing evidence, defendant insists that because the jury at his 2013 trial did not view his videotaped statement and "hung on the kidnapping, rape, and sexual offense charges[,]" he was prejudiced when the jury at his 2014 trial viewed the videotape and subsequently convicted him of rape and kidnapping. Defendant also contends that when the videotape was erroneously admitted at his 2014 trial, he was "all but forced" to testify, something he did not do at his 2013 trial. We view this as pure speculation. Although defendant asserts that he had to take the stand at his retrial to "clarify any unresolved factual issues created by the videotape[,]" he fails to state what those factual issues were. Quite simply, defendant had a choice to either testify in his own defense during his 2014 retrial or simply refuse to do so. He chose the former.
Nevertheless, the dissent agrees with defendant's reasoning, and adds that because defendant testified at his 2014 trial, the State was able to impeach him with prior convictions, including an August 2013 conviction of assault on a female which arose from the same incident with T.H. Defendant's credibility, however, had already been significantly impugned before the prior conviction evidence was presented. Indeed, the State used defendant's statement to Detective Wenhart to impeach defendant's trial testimony on several points. "A statement taken in violation of a defendant's Miranda rights may nonetheless be used to *550 impeach the defendant's credibility if (1) the statement was not involuntary, and (2) the defendant testified at trial." State v. Purdie, 93 N.C.App. 269, 279, 377 S.E.2d 789, 795 (1989) (citing Harris v. New York, 401 U.S. 222, 224, 91 S.Ct. 643, 645, 28 L.Ed.2d 1, 4 (1971) ). Since the above criteria were met in this case, the cross-examination questions of defendant regarding his statement were proper. Id. at 279-80, 377 S.E.2d at 795 ; *338 Harris, 401 U.S. at 225-26, 91 S.Ct. at 645-46, 28 L.Ed.2d at 4-5 ; State v. Stokes, 357 N.C. 220, 226, 581 S.E.2d 51, 55 (2003). Consequently, the State had already questioned and damaged defendant's character for truthfulness by the time it chose to utilize the prior conviction evidence.
In sum, defendant essentially argues that "history repeats itself," and he asks us to assume that all other factors-the jury's makeup, the effect of the testimony, the lawyering, etc.-relevant to the outcome of his 2013 and 2014 trials were the same except for the erroneous admission of his statement, which supposedly forced him to testify the second time around. We reject this argument. Our Supreme Court has noted that "[o]rdinarily, where a confession made by the defendant is erroneously admitted into evidence, we cannot say beyond a reasonable doubt that the erroneous admission of the confession did not materially affect the result of the trial to the prejudice of the defendant." State v. Siler, 292 N.C. 543, 552, 234 S.E.2d 733, 739 (1977). Here, there was no confession. Quite the opposite occurred. Since the videotaped statement did not inculpate defendant on any charges, and the State presented overwhelming evidence on the rape charge, we conclude, beyond a reasonable doubt, that the outcome of defendant's trial would have been the same even if the videotape had been suppressed. See State v. Greene, 324 N.C. 1, 12, 376 S.E.2d 430, 438 (1989) (holding that, even assuming error, admission of the defendant's statement was harmless beyond a reasonable doubt because the "statement d[id] nothing to inculpate [the] defendant and [was] not probative of his guilt or innocence"), vacated on other grounds, 494 U.S. 1022, 110 S.Ct. 1465, 108 L.Ed.2d 603 (1990).
C. Judge Hill's Denial of Defendant's Motion to Dismiss the First Degree Kidnapping Charge
Finally, defendant argues the trial court erred by denying his motion to dismiss the first degree kidnapping charge because there was insufficient evidence that the confinement and restraint of T.H. was separate and apart from the rape. In making this argument, defendant insists that, "because the indictment alleged that [he] confined and restrained T.H. for the purpose of facilitating the forcible rape, the State ... had to prove both confinement and restraint" to support the kidnapping charge. Once again, we disagree.
*551 As an initial matter, we note that defendant incorrectly asserts the State bore the burden of proving both confinement and restraint to support the kidnapping charge. Kidnapping is a specific intent crime, and the State had to prove that defendant unlawfully restrained, confined, or removed T.H. "for one of the specified purposes outlined in the statute." State v. Moore, 315 N.C. 738, 743, 340 S.E.2d 401, 404 (1986). "Since an indictment need only allege one statutory theory, an indictment alleging all three theories is sufficient and puts the defendant on notice that the State intends to show that the defendant committed kidnapping in any one of the three theories." State v. Lancaster, 137 N.C.App. 37, 48, 527 S.E.2d 61, 69 (2000). Here, the indictment alleged that defendant restrained and confined T.H. to facilitate the commission of a felony, forcible rape. As a result, either one of those theories-restraint or confinement-could serve as the basis for the jury's finding on the kidnapping charge.
In terms of ruling on a motion to dismiss for insufficiency of the evidence, our Supreme Court
has held that ... the trial court must consider the evidence in the light most favorable to the State and give the State every reasonable inference to be drawn therefrom. The State is required to present substantial evidence for each element of the offense charged. The trial court must consider all evidence presented that is favorable to the State. If there is substantial evidence, either direct or circumstantial, that the defendant committed the offense charged, then a motion to dismiss is properly denied.
State v. Gainey, 355 N.C. 73, 89, 558 S.E.2d 463, 474 (2002) (citations omitted). "Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion." State v. Vick, 341 N.C. 569, 583-84, 461 S.E.2d 655, 663 (1995).
*339 Any person "who, without consent, unlawfully confines, restrains, or removes someone sixteen years of age or older shall be guilty of kidnapping when it is done for the purpose of facilitating commission of a felony." State v. Parker, 237 N.C.App. 546, 768 S.E.2d 1, 2 (2014) ; N.C. Gen.Stat. § 14-39(a)(2) (2013). Kidnapping becomes a first degree offense when a kidnapping victim is sexually assaulted. N.C. Gen.Stat. § 14-39(b) (2013). As used in subsection 14-39(a), the term "confine" means "some form of imprisonment within a given area, such as a room, a house or a vehicle." State v. Fulcher, 294 N.C. 503, 523, 243 S.E.2d 338, 351 (1978). The term "restraint" includes confinement, but also means *552 "restriction, by force, threat or fraud, without a confinement. Thus, one who is physically seized and held ... or who, by the threatened use of a deadly weapon, is restricted in his freedom of motion, is restrained within the meaning of this statute." Id.
However, "[i]t is self-evident that certain felonies (e.g., forcible rape and armed robbery) cannot be committed without some restraint of the victim." Id. To support a conviction on charges of both rape and kidnapping, "the restraint [or confinement], which constitutes the kidnapping, [must be] a separate, complete act, independent of and apart from the other felony." Id. at 524, 243 S.E.2d at 352. "[A] person cannot be convicted of kidnapping when the only evidence of restraint [or confinement] is that 'which is an inherent, inevitable feature' of another felony such as [rape]." State v. Beatty, 347 N.C. 555, 559, 495 S.E.2d 367, 369 (1998) (quoting Fulcher, 294 N.C. at 523, 243 S.E.2d at 351 ).
In determining whether the restraint in a particular case is sufficient to support a kidnapping charge,
[t]he court may consider whether the defendant's acts place the victim in greater danger than is inherent in the other offense, or subject the victim to the kind of danger and abuse that the kidnapping statute was designed to prevent. The court also considers whether defendant's acts "cause additional restraint of the victim or increase the victim's helplessness and vulnerability."
State v. Key, 180 N.C.App. 286, 290, 636 S.E.2d 816, 820 (2006) (citations omitted).
Here, "the commission of the underlying felony of rape did not require [defendant] to separately restrain or remove" T.H. from her living room couch to her bedroom. Key, 180 N.C.App. at 291, 636 S.E.2d at 821. T.H. demonstrated defendant's size relative to her own by describing him as "a body builder." In addition, when defendant abruptly picked T.H. up off of her couch, he immobilized her arms and lifted her feet off the ground. By way of this restraint, defendant gained full control of T.H. in her living room and could have raped her there, but instead, he chose to carry T.H. through her home and commit the rape in her bedroom. See State v. Blizzard, 169 N.C.App. 285, 290, 610 S.E.2d 245, 250 (2005) ("Asportation of a rape victim is sufficient to support a charge of kidnapping if the defendant could have perpetrated the offense when he first threatened the victim, and instead, took the victim to a more secluded area to prevent others from witnessing or hindering the rape."). Such movement and restraint constituted "a separate and independent act"
*553 not inherent to the rape in this case. Key, 180 N.C.App. at 291, 636 S.E.2d at 821.
When defendant removed T.H. from her living room to her bedroom, he also "increase[d her] helplessness and vulnerability." Id. at 290, 636 S.E.2d at 820. Specifically, when defendant was carrying T.H. through the kitchen, she began screaming, well-aware that both the front and back doors to her home were open. Once in the bedroom, T.H.'s chance of successfully attracting the attention and help of neighbors was significantly decreased. When viewed in the light most favorable to the State, the evidence was sufficient to establish that defendant, by physically seizing and restraining T.H. before carrying her away from open exterior doors and into the bedroom, facilitated his ability to commit the rape and "exposed [T.H.] to a greater degree of danger than that which is inherent in [rape]." State v. Ripley, 360 N.C. 333, 340, 626 S.E.2d 289, 294 (2006). Accordingly, the trial court properly denied *340 defendant's motion to dismiss the kidnapping charge.
III. Conclusion
When Judge Young declared a mistrial on the charges of kidnapping, rape, and sexual assault at defendant's 2013 trial, his suppression ruling had no binding legal effect. Neither the doctrine of collateral estoppel nor the rule that one Superior Court judge cannot overrule another applied to this ruling. As such, Judge Hill was free to rule anew on the suppression issue. Moreover, while the admission of defendant's videotaped statement at his 2014 trial was in violation of Miranda, the trial court's error did not prejudice defendant as it was harmless beyond a reasonable doubt. Finally, there was sufficient evidence to support defendant's conviction for first degree kidnapping.
NO PREJUDICIAL ERROR.
Judge TYSON concurs.
Judge STROUD concurs in part and dissents in part.

We note that defendant cites this rule in his discussion on res judicata and collateral estoppel, but we find it more appropriate to discuss it in the context of the law of the case doctrine. The essence of all defendant's arguments on the suppression issue is that Judge Young's ruling was absolutely binding on Judge Hill.