INMAN, Judge.
 

 *546
 
 Respondent-mother ("Mother") appeals from an order terminating her parental rights as to her minor children C.H. ("Clark")
 
 [1]
 
 and A.H. ("Andrew"). On appeal, Mother contends that the trial court abused its
 
 *547
 
 discretion by restricting her right to present evidence at the termination hearing and by determining that termination of her parental rights was in the best interests of Clark and Andrew. After careful review, we
 
 *869
 
 hold that the trial court did not abuse its discretion.
 

 Factual and Procedural History
 

 On 5 June 2002, Mother gave birth to Andrew. On 5 November 2006, Mother gave birth to Clark. The children's biological father passed away on 2 October 2010.
 

 On 20 April 2013, Mother, Andrew, and Clark were at a Food Lion in Durham, North Carolina. Andrew attempted to steal candy from the store, but was caught. Upon hearing of Andrew's attempted theft, Mother hit Andrew in the face, grabbed him around the neck in a choke hold position, and caused Andrew's head to hit a bank card swipe machine. Food Lion security personnel and other bystanders immediately intervened and stepped in between Mother and Andrew. Mother then exited the store with Clark, leaving Andrew behind. Mother did not leave any contact information. As Mother left, her car's license plate number was noted.
 

 The Durham County Police Department was notified and located Mother shortly after her exit. Mother claimed she left the Food Lion to go to the police department. Mother was charged with misdemeanor child abuse, misdemeanor assault on a child under twelve, and misdemeanor assault on a handicapped person.
 

 At the Durham Police Station, Mother told a social worker that she wanted Andrew and Clark to be placed in foster care, because she did not think her family members in Durham were good placements for the children. Andrew and Clark were immediately placed in a rapid response therapeutic home.
 

 The Durham County Department of Social Services ("DSS") filed petitions alleging that both Andrew and Clark were neglected. At the adjudication hearing on 6 June 2013, Mother stipulated to all of the court's findings of fact and the adjudication that both juveniles were neglected. At the conclusion of the disposition hearing on 2 July 2013, the trial court placed the children in the legal custody of DSS, allowed Mother supervised visitation, and ordered Mother to follow all recommendations resulting from a psychological evaluation, including anger management.
 

 At the time of the grocery store incident and initial placement, Andrew was ten years old and Clark was six years old. Both children
 
 *548
 
 suffered from behavioral and developmental disorders. Andrew had been diagnosed with Attention Deficit Hyperactivity Disorder, developmental delay, and Major Depressive Disorder, and was receiving services for autism, behavioral issues, and anxiety. Additionally, Andrew received occupational therapy. Clark had been diagnosed with developmental delay, speech impairment, and epilepsy, and suffered from seizures. Like his brother, Clark also received occupational therapy. Although it was unknown if a formal diagnosis had been made, Clark demonstrated symptoms of autism and Attention Deficit Hyperactivity Disorder.
 

 On 15 July 2013, Andrew was hospitalized after running away from his foster home and expressing suicidal tendencies. Andrew was admitted to the Duke Medical Center Emergency Department, where he expressed that he was upset he did not get to speak with Mother and stated he wanted to live with her and his brother. Mother attempted to visit Andrew while he was in the emergency department, but hospital policies did not allow visitation. Andrew's mental health medical team recommended he be placed in a therapeutic foster home that could provide Intensive Alternative Family Therapy. The team also recommended that Andrew be placed in a home where he would be the only child and that the foster parent(s) have prior experience or special training with parenting autistic children.
 

 On 5 September 2013, after conducting a hearing to review the custody and placement of Andrew and Clark, the trial court entered a Review Order. The court found that Clark had remained in the same foster care placement since 4 June 2013 and that Mother had participated in autism support groups, reviewed the children's care with social workers, and attended medical appointments for the children. The court concluded that it was in the best interest of the children to remain in the legal custody of DSS, with DSS having placement authority. The court ordered Mother to continue in individual therapy for anger management and parenting skills,
 
 *870
 
 maintain visitation with the children, and participate in other services or therapy as recommended.
 

 On 5 October 2013, Andrew was re-hospitalized after running away again from his foster home. While at the hospital, Andrew expressed, again, that he wanted to live with his mother. Andrew continued to express suicidal thoughts. Clark had been moved from his previous foster home, and was placed in a new foster home.
 

 On 4 and 6 December 2013, the trial court held an initial permanency planning hearing. On 6 January 2014, the trial court entered a
 
 *549
 
 Permanency Planning Order concluding that "it is in the best interest[s] of the children that the permanent plan of care be reunification with the mother[.]" The court's findings of fact noted Andrew's second hospitalization, his move to a new foster care home, and his ongoing condition. The court also found that Mother had attended supervised visits, medical appointments, treatment team meetings, Child and Family Team meetings, and individual weekly therapy sessions. The court ordered Mother to continue with the same services and to participate in and complete a forensic parental evaluation.
 

 Two months later, on 10 March 2014, Andrew ran away from school and, when found, expressed to officers that that he wanted to be run over by a car. Andrew's medical team recommended a stay at Spring Brook Behavioral Healthcare ("Spring Brook"), and Andrew was placed at Spring Brook on 27 March 2014. Mother participated in family therapy at Spring Brook. During a family therapy session, Mother expressed to Andrew her hatred towards Brianna Dearing ("Dearing"), a social worker. Mother stated she wanted to beat Dearing "bad." When Andrew explained Dearing was trying to help them, Mother said, "no[,] she is not helping us," and spoke for about three minutes about how she could beat Dearing to death. Due to Mother's statements regarding Dearing, the therapist redirected Mother out of the room.
 

 On 3 June 2014, after conducting a permanency planning review hearing on 2 May 2014, the trial court entered a Permanency Planning Review Order. The trial court found that as of the 2 May 2014 hearing, Mother had completed all services with the Autism Society of North Carolina and had begun a parenting program. The court further found that while the children could not return home immediately, reunification was possible within the following six months.
 

 On 25 September 2014, the court held another permanency planning review hearing. In an order entered in open court that same day, the court found that Andrew had shown improvement while at Spring Brook and had stopped inflicting and threatening self-harm. Andrew's therapist reported that Andrew recounted spankings by his older brother and an incident where Mother duct-taped Andrew's feet together. The therapist indicated that Andrew expressed a desire for revenge and anger towards his family. Mother had visited Andrew at Spring Brook, until her visitation was suspended because of her disruptive behavior during two visits. Once she was allowed to resume supervised visitation, Mother was unable to do so due to a staff shortage. Clark was doing well with his foster family and in school. Mother was attending parenting classes and visitations but had "not consistently demonstrated positive parenting
 
 *550
 
 skills during visitation[s]." The court changed the permanent plan of care, adding guardianship by a court-approved caretaker as an alternative to reunification with Mother. The court directed Mother to continue participating in individual therapy.
 

 On or about 4 November 2014, DSS filed a motion to modify visitation. The motion alleged that on 23 October 2014, Clark attended supervised visitation with Mother in her home. During this visit, Clark had a "melt down" and Mother dragged Clark to a time out. The supervisor found it "difficult" to redirect Mother during visits, as Mother had refused to change her behavior. DSS requested that all visitation be supervised and located at DSS.
 

 On 8 June 2015, more than two years after Andrew and Clark were removed from Mother's custody and initially adjudicated neglected, the trial court entered a Permanency Planning Review Order changing the permanent plan of care to adoption, with an alternate plan of guardianship by a court-approved
 
 *871
 
 caretaker. The court's findings noted,
 
 inter alia
 
 , a report by Andrew's therapist that Mother "consistently minimizes [Andrew]'s feelings about past incidents and that she often becomes angry" during the phone conversations and a report by Clark's social worker that his "most disruptive days continue to be the days when he has visits with his mother."
 

 The court found that Mother had not completed all recommended services, had refused to participate in family therapy for Andrew, and had not changed her parenting behavior. The court found that "[Mother] continues to have unrealistic expectations for [Andrew's and Clark's] behaviors and is unwilling to work on managing their mental health issues. She continues to insist their behaviors arise solely from residing in foster care and not due to her own parenting approach." The court found that the permanent plan of reunification could not be implemented at that time because Mother "ha[d] not completed all of the recommended services, nor ha[d] she consistently demonstrated positive parenting skills during visitation." The court concluded that reunification efforts with Mother would be either futile or inconsistent with the children's health, safety, and need for a safe permanent home within a reasonable period of time.
 

 On or about 1 June 2015, DSS filed a Motion/Petition for Termination of Parental Rights. DSS alleged Mother's parental rights were subject to termination pursuant to N.C. Gen. Stat. §§ 7B-1111(a)(1) (neglect), (2) (failure to make reasonable progress), (3) (failure to pay a reasonable portion of the cost of the children's care), and (6) (dependency).
 

 *551
 
 On 5 August 2015, Mother subpoenaed Andrew to appear and testify at Mother's termination of parental rights hearing.
 

 On 11 August 2015, Mother personally filed with the trial court a ten-page report entitled "Respondent Parent's Court Summary" ("the Parent Report"). Mother attached to the Parent Report documents that she intended to submit at the termination proceeding.
 

 On 13 August 2015, the Guardian Ad Litem Attorney Advocate ("GAL") filed a motion to quash Mother's subpoena for Andrew's testimony. The motion to quash alleged that Andrew "will likely experience significant emotional distress and regress from his recent progress in therapy, if required to appear and testify in this proceeding." The GAL argued the subpoena was unreasonable and oppressive. The GAL attached a letter from Andrew's therapist, which provided, in pertinent part:
 

 This letter is to inform the court in the case of [Andrew] and his inability to provide testimony in court proceedings. The KidsPeace clinical team have staffed this case and determined that [Andrew]'s presence in court and testimony would be detrimental to his treatment progress and stability.
 

 ...
 

 Should [Andrew] be required to testify[,] he will likely experience an emotional and behavioral regression as indicated by previous exposure to this topic when talking with [Mother] during supervised phone calls. The team has observed [Andrew] experience mood disturbances, behavioral regression, and an increase in symptoms of trauma after these conversations. Although the origin of this regression is unclear, it appears closely related to the topic of court. After requesting that these conversations cease, symptoms and behaviors subsided. It is therefore clinically recommended that [Andrew] not provide testimony in court to maintain treatment gains and promote well-being.
 

 On 14 August 2015, Mother filed a response opposing the GAL's motion to quash. Mother's response focused on Andrew's competency and that Andrew's testimony would be relevant to the termination proceeding.
 

 On 19 August 2015, the trial court held a hearing on the motion to quash. In an order entered 19 October 2015, the court found that
 
 *552
 
 according to Andrew's therapist, he would "likely experience significant emotional distress and regress from his recent progress in therapy, if required to appear and testify in this proceeding." Additionally, the court found that Mother "could not clearly articulate
 
 *872
 
 any factual issues within the child's knowledge that were necessary to her defense of the termination action, and unavailable from other sources." The court concluded: "1. Any testimony of the child would be of little probative value[;] 2. The experience of testifying is likely to cause the child significant emotional harm [; and] 3. The best interests of the child are this court's paramount concern." Based on its findings and conclusions, the court quashed Mother's subpoena.
 

 On 14 August 2015, Mother's counsel delivered to the Guardian ad Litem Durham Office and the DSS County Attorney all of the documentary evidence that she sought to admit at the termination proceeding in a multi-pronged file folder (the "Green Folder"). The Green Folder contained numerous documents, including the Parent Report, which Mother had filed
 
 pro se
 
 with the trial court. On 6 October 2015, the GAL filed a "GAL's Response to Mother's Proposed Evidence & Motion in Limine," seeking to exclude from evidence the contents of the Green Folder. The GAL provided specific responses regarding the relevancy of each document contained in the Green Folder, specifically noting that the Parent Report "[s]hould not have been filed, [ ] needs to be struck from the court file[,]" and "[s]hould not be introduced prior to [the] best interests phase, if reached."
 

 On 19 October 2015, prior to the commencement of the adjudication phase of the termination proceeding, the trial court conducted a hearing on the GAL's motion
 
 in limine
 
 . On that day, the trial court granted the GAL's motion with respect to the Parent Report, noting that it was filed without the signature of counsel. The trial court also granted the GAL's motion to exclude from evidence the other contents of the Green Folder.
 

 The court held hearings to determine whether grounds existed to terminate Mother's parental rights beginning on 19 October, and continuing on 20 October, 21 October, and 19 November 2015. On 19 November 2015, the adjudication phase of the termination hearing (the "adjudication hearing") ended and the trial court found in open court "clear and convincing evidence that grounds exist for termination of parental rights." Later that same day, the trial court conducted the disposition phase of the termination hearing (the "disposition hearing") and determined in open court that termination of Mother's parental rights was in the best interests of the children. A written order on the termination proceeding was entered 19 January 2016. In the order, the court found
 
 *553
 
 clear, cogent, and convincing evidence of N.C. Gen. Stat. § 7B-1111(a)(1) (neglect), (2) (failure to make reasonable progress), (3) (failure to pay a reasonable portion of the cost of care for Andrew and Clark), and (6) (dependency) as grounds for termination of Mother's parental rights. The court also concluded that "it is in the best interests of [Andrew] and [Clark] that the parental rights of their mother be terminated."
 

 Mother filed a Notice of Appeal from the 8 June 2015 Permanency Planning Review Order, the 19 October 2015 Order Quashing Subpoena, and the 19 January 2016 Order Terminating Parental Rights. However, in her brief filed with this Court, Mother does not challenge the 8 June 2015 Permanency Planning Review Order, which ceased reunification efforts.
 

 Standard of Review
 

 "The court's determination of the juvenile's best interest will not be disturbed absent a showing of an abuse of discretion."
 
 In re E.M.
 
 ,
 
 202 N.C.App. 761
 
 , 764,
 
 692 S.E.2d 629
 
 , 630 (2010) (citation omitted). "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision."
 
 State v. Hennis
 
 ,
 
 323 N.C. 279
 
 , 285,
 
 372 S.E.2d 523
 
 , 527 (1988) (citation omitted).
 

 The trial court's evidentiary decisions, including a decision granting a motion to quash a subpoena on grounds that it is unduly burdensome, also will not be disturbed absent a showing of abuse of discretion.
 
 See
 

 State v. Hurt
 
 ,
 
 235 N.C.App. 174
 
 , 182,
 
 760 S.E.2d 341
 
 , 348,
 
 review denied
 
 ,
 
 367 N.C. 807
 
 ,
 
 766 S.E.2d 679
 
 (2014) ("A motion to quash a subpoena is addressed to the sound discretion of the trial court and is not subject to review absent a showing of an abuse of discretion.").
 

 *873
 

 Analysis
 

 Mother contends that the trial court abused its discretion by restricting her right to present evidence at the termination proceeding. Additionally, Mother asserts that the trial court abused its discretion in determining that termination of her parental rights was in the best interests of Andrew and Clark. For the reasons discussed below, we disagree with Mother's arguments.
 

 A termination of parental rights proceeding consists of a two-step process: an adjudication phase and a disposition phase.
 
 In re Montgomery
 
 ,
 
 311 N.C. 101
 
 , 110,
 
 316 S.E.2d 246
 
 , 252 (1984) ;
 
 In re Blackburn
 
 ,
 
 142 N.C.App. 607
 
 , 610,
 
 543 S.E.2d 906
 
 , 908 (2001). In the adjudication phase, "the court must take evidence, find the facts, and adjudicate the existence or nonexistence of any of the circumstances set forth in
 
 *554
 
 N.C. Gen. Stat. § 7B-1111, which authorizes the termination of the respondent's parental rights."
 
 In re J.A.A.
 
 ,
 
 175 N.C.App. 66
 
 , 75,
 
 623 S.E.2d 45
 
 , 51 (2005) (citation omitted);
 
 see also
 
 N.C. Gen. Stat. § 7B-1111 (2015).
 

 "After finding that grounds for termination exist, the trial court moves to the disposition phase."
 
 In re A.R.H.B.
 
 ,
 
 186 N.C.App. 211
 
 , 218,
 
 651 S.E.2d 247
 
 , 253 (2007) (citation omitted). In the disposition phase or the "best interest" phase, the trial court "must determine whether termination of parental rights is in the best interests of the child."
 
 In re R.B.B.
 
 ,
 
 187 N.C.App. 639
 
 , 643,
 
 654 S.E.2d 514
 
 , 518 (2007). At this phase, "[t]he court may consider any evidence, including hearsay evidence ... that the court finds to be relevant, reliable, and necessary to determine the best interests of the juvenile." N.C. Gen. Stat. § 7B-1110(a) (2015). The North Carolina Supreme Court has held that
 

 [w]henever the trial court is determining the best interest of a child, any evidence which is competent and relevant to a showing of the best interest of that child must be heard and considered by the trial court, subject to the discretionary powers of the trial court to exclude cumulative testimony. Without hearing and considering such evidence, the trial court cannot make an informed and intelligent decision concerning the best interest of the child.
 

 Matter of Shue
 
 ,
 
 311 N.C. 586
 
 , 597,
 
 319 S.E.2d 567
 
 , 574 (1984).
 

 I. Right To Present Evidence
 

 Mother contends that the trial court abused its discretion by restricting her right to present evidence at the termination hearing. Specifically, Mother argues that the trial court erred in: (1) quashing her subpoena for Andrew's testimony, (2) not allowing her to make an offer of proof as to what Andrew would have said if he testified, (3) not allowing her to present the Parent Report, and (4) applying one set of evidentiary rules to Mother and a more lenient set of evidentiary rules to other parties. We disagree.
 

 A.
 
 Quashing of the Subpoena
 

 As an initial matter, we must clarify the specific phase of the termination proceeding during which, by quashing her subpoena, Mother contends the trial court restricted her right to present evidence. At the hearing on the motion to quash, when questioned about which phase of the termination proceeding she sought to present Andrew's testimony in, Mother responded "[t]hat's my decision. That's my attorney's decision." However, on appeal, Mother does not challenge the adjudication phase
 
 *555
 
 of the termination proceeding, noting "[a]dmittedly, the court correctly found grounds to terminate parental rights[.]" Accordingly, we review whether the trial court's quashing of the subpoena restricted Mother's right to present evidence at the disposition or "best interest" phase of the termination proceeding.
 

 The GAL requested the trial court quash Mother's subpoena on the basis that compelling Andrew to appear and testify during either phase of the termination proceeding would be "unreasonable and oppressive."
 
 See
 
 N.C. Gen. Stat. § 1A-1, Rule 45(c)(3) and (5) (2015) (providing that a trial court may modify or quash a subpoena if the subpoenaed person demonstrates the existence of certain grounds, including that the subpoena is otherwise unreasonable or oppressive). As support for the notion that the subpoena was unreasonable and oppressive, the GAL noted the following pertinent facts:
 

 *874
 
 6. In a phone conversation in early July, 2015, mother told [Andrew] that she was going to have her attorney interview him, and that she wanted him to testify at the TPR hearing. In the days that followed, [Andrew] was agitated, and observed to be walking in his sleep. Mother was warned that this topic was upsetting to [Andrew]. ...
 

 7. The child ha[d] not expressed any desire to participate in the hearing on termination of his mother's parental rights.
 

 8. According to the child's therapist, he will likely experience significant emotional distress and regress from his recent progress in therapy, if required to appear and testify in this proceeding.
 

 Additionally, the GAL attached a letter from Andrew's therapist stating "[t]he Kidspeace clinical team have staffed this case and determined that [Andrew's] presence in court and testimony would be detrimental to his treatment progress and stability."
 

 The motion to quash the subpoena came on for hearing on 19 August 2015. Andrew's therapist, Stephanie Batchelor ("Batchelor"), and Mother testified at the hearing. Batchelor testified that Andrew had not, in their conversations, expressed any interest in participating in the termination proceeding. On cross examination, counsel for Mother and Batchelor engaged in the following exchange:
 

 MOTHER'S COUNSEL: So, it is correct that you do believe that [Andrew] could participate in a limited capacity in this hearing?
 

 *556
 
 BATCHELOR: If it was so required I think that you would probably not get what you hope to because of his level of anxiety and that he does have some limited insights.
 

 Following Batchelor's testimony, Mother testified. Mother's counsel inquired as to what topics Mother expected Andrew to testify about, which resulted in the following exchange:
 

 [MOTHER]: Well there are a number of things uhm, that he could potentially tell you. Uhm, about his life with me and uhm, his life in foster care and how different the two are and whether it be a positive or a negative uhm, change being in foster care. Uhm, the experiences being institutionalized for nine months and being hospitalized three times in nine [months] under DSS's custody. Uhm, he's been through a traumatic time. He's been out of school for most of the two years. His IEP was out of compliance for most of the two years that he's been in foster care. He could tell you a number of things but his experience has not been positive. His uhm, experience in foster care has been a detriment.
 

 THE COURT: Okay, [Mother], I'm going to interrupt you. I don't want you to testify about what you perceive his experience to be. I think the question was what did you expect him, the subject matter that you expected to elicit from him.
 

 [MOTHER]: Okay.
 

 THE COURT: And I believe that question's been answered.
 

 Mother testified that Andrew's "wants and needs from his perspective need[ ] to be presented to the [c]ourt." Furthermore, Mother testified that "I'm aware that [Andrew] could [testify] in chambers or he could [testify] off site, or remotely, but he still needs that opportunity. It doesn't absolutely have to be in the courtroom." Thereafter, the trial court concluded:
 

 All right, the [c]ourt has heard testimony as well as reviewed the uhm, GAL Exhibits and Petitioner's Exhibits and the [c]ourt finds that given the burdens of proof in a hearing to terminate parental rights, that the testimony of one of the two minor children which are the subject of these hearings would be of extremely limited prohibitive [sic] value and in fact in a balancing test of concerns it
 
 *557
 
 would overwhelmingly ... be detrimental to his well-being and the guiding star in this courtroom is the best interests of minor children and having so concluded that it would be of limited prohibitive [sic] value and detrimental, the [c]ourt quashes the subpoena issue in this matter.
 

 The trial court memorialized the order quashing the subpoena on 19 October 2015, finding the following:
 

 *875
 
 1. [Andrew] is thirteen years old, and under the care of therapist, Stephanie Batchelor.
 

 ...
 

 3. [Andrew] has had little face-to-face contact with his mother since March, 2015, and no visitation. Mother participated in one session of family therapy with [Andrew], but then refused to attend further sessions. Said family therapy was made a precondition to resumed supervised visitation by this court's order, entered March 17, 2015.
 

 4. The conditions that led to the removal of [Andrew] have already been adjudicated, and those findings of fact and conclusions of law are beyond appeal. The hearing on terminating mother's parental rights will focus on mother's progress in completing the things this court determined were necessary to correct the conditions that led to removal, and mother's present mental health. [Andrew] has little direct knowledge of these things.
 

 5. In a phone conversation in early July, 2015, mother told [Andrew] that she was going to have her attorney interview him, and that she wanted him to testify at the TPR hearing. In the days that followed, [Andrew] appeared agitated. Mother was warned that this topic was upsetting to [Andrew]. Mother subsequently requested the address of the child's foster home, in order to mail a subpoena directly to the child. DSS did not provide the address. Mother's attorney served the subpoena upon the attorney for the GAL program.
 

 6. According to the child's therapist, he will likely experience significant emotional distress and regress from his recent progress in therapy, if required to appear and testify in this proceeding.
 

 *558
 
 7. The burden of proof in the termination of parental rights is upon the petitioner, Durham County DSS. Mother could not clearly articulate any factual issues within the child's knowledge that were necessary to her defense of the termination action, and unavailable from other sources.
 

 Based on these findings, the trial court made the following conclusions:
 

 1. Any testimony of the child would be of little probative value.
 

 2. The experience of testifying is likely to cause the child significant emotional harm.
 

 3. The best interests of the child are this court's paramount concern.
 

 Mother argues that the trial court "failed to adequately consider the relevancy of any testimony by Andrew." After careful review of the transcript of the hearing and the written order, we disagree with Mother's contention and hold that the trial court sufficiently considered the relevancy of Andrew's testimony as to the termination proceeding in determining whether to quash Mother's subpoena.
 

 Mother did not specify before the trial court that she was requesting Andrew's testimony at the disposition hearing. Several of the trial court's findings of fact in the subpoena order relate to the relevance of Andrew's testimony as to the adjudication hearing. However, the record reflects that the trial court also considered the relevance of Andrew's testimony to the disposition hearing. At the hearing on the GAL's motion to quash the subpoena, Mother outlined the topics she expected Andrew to testify about, including his life with Mother and his life in foster care, and his experiences in foster care. The trial court found that Andrew "has had little face-to-face contact with his mother since March, 2015, and no visitation." This finding is relevant to the bond between the parent and child-one of the six factors the relevant statute directs the trial court to consider in determining the best interests of the child.
 
 See
 
 N.C. Gen. Stat. § 7B-1110(a). The trial court's conclusion that "[a]ny testimony of the child would be of little probative value" demonstrates that it adequately considered the relevancy of Andrew's testimony as to the termination proceeding as a whole, including the disposition hearing.
 

 In determining whether to quash the subpoena, the trial court also considered if testifying was in Andrew's best interest. The court admitted into evidence and considered a letter written by Batchelor on
 
 *559
 
 12 August 2015. The court also heard the opinion of Batchelor that testifying "could potentially pose a risk factor for [Andrew] to emotionally
 
 *876
 
 and behaviorally regress and cause increased anxiety." Batchelor testified that "it's my understanding based on two phone calls in which [Mother] discussed court testimony with [Andrew], ... he appeared distressed and with a labile mood and some behavioral regression afterwards." The trial court concluded that "[t]he experience of testifying is likely to cause the child significant emotional harm" and "[t]he best interests of the child are this court's paramount concern."
 

 By presenting comprehensive evidence regarding Andrew's mental health condition and his extreme distress during and following contacts with Mother regarding her desire that he testify, the GAL properly demonstrated that the subpoena for Andrew was "unreasonable or oppressive." Mother has failed to show that the trial court abused its discretion in quashing the subpoena. We therefore affirm the trial court's decision.
 

 B.
 
 Offer of Proof
 

 Mother contends that the trial court erred during the disposition hearing by denying her request to make an offer of proof as to what Andrew would have said if he were allowed to testify. We disagree.
 

 Mother alleges error based on the following exchange at the disposition hearing between Mother, her attorney, and the trial court:
 

 MOTHER'S COUNSEL: And why did you want to have [Andrew] testify in this hearing?
 

 MOTHER: I wanted him to speak for himself.
 

 MOTHER'S COUNSEL: Okay.
 

 MOTHER: Because Ms. Dearing has been speaking for him.
 

 MOTHER'S COUNSEL: Okay. Uhm, what do you believe [Andrew] would have said if he, if he would have testified, regarding your relationship?
 

 THE COURT: Sustained.
 

 MOTHER'S COUNSEL: Your Honor, this is something that's actually required uhm, for the record and for the higher courts that whenever a subpoena for a child is quashed there has to be, this has to be on the record what the child would have testified to-
 
 *560
 
 THE COURT: No, I don't think that's a correct statement of the law. I think the person may be required to submit a proffer about the subject matter but to have someone else and speak and say that if this person came they would have said XYZ, uhm, is rather preposterous.
 

 MOTHER'S COUNSEL: Okay.
 

 THE COURT: The objection is sustained.
 

 MOTHER'S COUNSEL: Okay, thank you, [y]our Honor.
 

 MOTHER: Can I provide a proffer?
 

 THE COURT: No, you may not.
 

 The trial court's statement that "I think the person may be required to submit a proffer about the subject matter but to have someone else and speak and say that if this person came they would have said XYZ ... is rather preposterous" misstated North Carolina statute and precedent. The North Carolina Code of Evidence provides that a litigant cannot obtain relief on appellate review from a ruling excluding evidence unless, "the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked." N.C. Gen. Stat. § 8C-103(a)(2) (2015). The North Carolina Supreme Court has held that
 

 in order for a party to preserve for appellate review the exclusion of evidence, the significance of the excluded evidence must be made to appear in the record and a specific offer of proof is required unless the significance of the evidence is obvious from the record. ... [T]he essential content or substance of the witness' testimony must be shown before we can ascertain whether prejudicial error occurred.
 

 State v. Simpson
 
 ,
 
 314 N.C. 359
 
 , 370,
 
 334 S.E.2d 53
 
 , 60 (1985) (citation omitted).
 

 The trial court's misstatement of the law was not, however, an abuse of discretion in this case, because the essential content or substance of testimony that Mother sought to elicit from Andrew had been previously made known to the trial court. Prior to the disposition hearing, during the hearing on the
 
 *877
 
 GAL's motion to quash Mother's subpoena of Andrew, Mother testified:
 

 *561
 
 Well there are a number of things uhm, that he could potentially tell you. Uhm, about his life with me and uhm, his life in foster care and how different the two are and whether it be a positive or a negative uhm, change being in foster care. Uhm, the experiences being institutionalized for nine months and being hospitalized three times in nine [months] under DSS's custody. Uhm, he's been through a traumatic time. He's been out of school for most of the two years. His IEP was out of compliance for most of the two years that he's been in foster care. He could tell you a number of things but his experience has not been positive. His uhm, experience in foster care has been a detriment.
 

 This Court has held that "[t]hough a
 
 formal
 
 offer is the preferred method, there are reasons where a trial court may deem an informal offer to be appropriate."
 
 State v. Martin
 
 , --- N.C. App. ----, ----,
 
 774 S.E.2d 330
 
 , 333 (2015),
 
 review denied
 
 , --- N.C. ----, ----,
 
 775 S.E.2d 844
 
 (2015). This Court has explained that
 

 an informal offer is only sufficient when the attorney making the offer demonstrates a specific forecast of what the testimony would be, rather than merely his guess as to what the witnesses might say. A specific forecast would typically include the substance of the testimony (as opposed to merely stating what he plans to ask the witness), the basis of the witness' knowledge, the basis for the attorney's knowledge about the testimony, and the attorney's purpose in offering the evidence.
 

 Id.
 

 at ----,
 
 774 S.E.2d at 333
 
 (internal quotation marks, citations, and alterations omitted).
 

 At the hearing on the GAL's motion to quash the subpoena, Mother represented to the court a "specific forecast" of Andrew's testimony. Mother stated that Andrew could testify about his life with her and his life in foster care and the difference between the two; his experience being institutionalized for nine months and hospitalized three times while in DSS custody; his IEP being out of compliance during his time in foster care; and his experience in foster care being a detriment. In addition to forecasting the substance of Andrew's testimony, Mother represented the basis of Andrew's knowledge as being his own personal knowledge and the basis of her knowledge about Andrew's testimony as being her opinion. Finally, Mother represented that her purpose in offering Andrew's testimony was so his "wants and needs from his
 
 *562
 
 perspective" could be presented to the court. We hold that Mother's testimony at the subpoena hearing provided a sufficient informal offer of proof that the trial court could, in its discretion, rely upon in excluding a formal offer of proof because Mother's prior testimony "establish[ed] the essential content or substance of the excluded testimony."
 
 State v. Walston
 
 ,
 
 229 N.C.App. 141
 
 , 145,
 
 747 S.E.2d 720
 
 , 724 (2013),
 
 reversed on other grounds
 
 ,
 
 367 N.C. 721
 
 ,
 
 766 S.E.2d 312
 
 (2014).
 

 At the disposition hearing, following the trial court's statement indicating that an offer of proof must be limited to the subject matter of anticipated testimony, Mother's counsel did not attempt to make a further or different offer. Mother, not her counsel, then asked the trial court to allow her to testify about what she expected Andrew's testimony to be, and the trial court rejected Mother's personal request. We note that the better practice for Mother's counsel would have been to announce to the trial court the intention to make an offer of proof before seeking testimony from Mother about what Andrew would say if called to testify, so that it would be clear to the trial court that Mother was not offering into evidence testimony that was hearsay or lacking foundation. We also note that the better practice for the trial court would have been to allow Mother's counsel to proceed in making a formal offer of proof. However, we cannot conclude that the trial court, after having heard and considered Mother's proffered information at a prior hearing, abused its discretion in rejecting Mother's proffer at the disposition hearing. In the context of all the evidence presented, we cannot hold that the trial court's ruling was "so arbitrary that it could not have been the result of a reasoned decision."
 
 Hennis
 
 ,
 
 323 N.C. at 285
 
 ,
 
 372 S.E.2d at 527
 
 .
 

 *878
 
 C.
 
 Parent Report
 

 Mother contends that the trial court abused its discretion when it did not allow her to introduce her Parent Report and other documents into evidence at the disposition hearing. We reject this argument because Mother failed to preserve the issue for appellate review.
 

 Prior to the start of the adjudication hearing, on 19 October 2015, the trial court conducted a hearing on the "GAL's Response to Mother's Proposed Evidence & Motion in Limine." Counsel for all parties were present and had the opportunity to be heard. The trial court focused on the impropriety of Mother's filing of the Parent Report and the other documents contained in the Green Folder independent of her counsel, in violation of the North Carolina Rules of Civil Procedure. The trial court granted the GAL's motion
 
 in limine
 
 , and ordered that the documents be stricken "in their entirety from the [c]ourt file."
 

 *563
 
 The court's ruling excluding the documents from evidence and striking them from the record prior to the adjudication hearing did not prevent Mother's counsel from seeking to properly introduce them as evidence during the disposition hearing. Mother's counsel failed to proffer the Parent Report and all contents of the Green Folder during the disposition hearing, and, as such, Mother has not preserved this issue for appellate review.
 
 See
 

 State v. McCall
 
 ,
 
 162 N.C.App. 64
 
 , 68,
 
 589 S.E.2d 896
 
 , 899 (2004) (holding that where a motion
 
 in limine
 
 is granted, "[i]n order to preserve the underlying evidentiary issue, a party ... is required ... to attempt to introduce the evidence at the trial") (internal quotation marks, citations, and alterations omitted). The reason for this requirement is that the trial court's ruling on a motion
 
 in limine
 
 is preliminary to any evidence, and the court may reconsider the admissibility of challenged evidence based on other evidence presented at trial.
 
 Heatherly v. Indus. Health Council
 
 ,
 
 130 N.C.App. 616
 
 , 619-20,
 
 504 S.E.2d 102
 
 , 105 (1998) (holding that "the court's ruling is not a final ruling on the admissibility of the evidence in question, but only interlocutory or preliminary in nature. Therefore, the court's ruling on a motion
 
 in limine
 
 is subject to modification during the course of the trial[ ]"). For example, during the disposition hearing, Mother's counsel introduced in evidence a 2015 letter from Dr. Morris at Duke Medicine that Mother had attached to the Parent Report and included in the Green Folder. Over the GAL's objection, the trial court admitted the document into evidence.
 

 D.
 
 Different Evidentiary Rules
 

 Mother contends the trial court abused its discretion by applying a different set of evidentiary rules to her than it did to other parties. We disagree.
 

 Mother testified and presented evidence during the disposition hearing, the only phase of the termination proceeding at issue in her appeal. Mother argues that "[t]he trial court's refusal to allow the [Parent Report] was just another example of its double standard during the best interest phase." We reject this argument because, as discussed
 
 supra
 
 , Mother's counsel did not seek to introduce the Parent Report during the disposition hearing.
 

 Mother also argues that the trial court violated her due process rights by quashing her subpoena for Andrew's testimony. One purpose of the Juvenile Code is "[t]o provide procedures for the hearing of juvenile cases that assure fairness and equity and that protect the constitutional rights of juveniles and parents[.]" N.C. Gen. Stat. § 7B-100 (2015) ;
 
 see also
 

 In re L.D.B.
 
 ,
 
 168 N.C.App. 206
 
 , 209,
 
 617 S.E.2d 288
 
 , 290 (2005)
 

 *564
 
 (holding that a respondent father's right to present evidence in a termination hearing "is inherent in the protection of due process[ ]").
 

 As explained above, we hold that the trial court did not abuse its discretion in quashing the subpoena for Andrew's testimony. The trial court's decision to quash Mother's subpoena was based on a reasonable weighing by the trial court of the relevance of Andrew's testimony and the detrimental effect that testifying would have on Andrew. A careful review of the record demonstrates that the trial court's evidentiary rulings "assure[ed] fairness and equality" and provided
 
 *879
 
 Mother with a meaningful opportunity to participate in the termination proceeding.
 

 At the disposition hearing, the trial court admitted the following exhibits presented by Mother: a 12 May 2014 letter from Dr. Alexander Myers and Louise Southern at the Autism Society of North Carolina; letters dated 21 July 2015 and 22 September 2015 from Dr. Beatriz Morris at Duke Children's Primary Care; an evaluation report sent from the diagnostic team to the IEP Committee of Clark's school; and a letter dated 17 August 2015 from Dr. Barbara Keith Walter with Duke University Medical Center. Moreover, prior to the disposition hearing, Mother was provided with reports putting her on notice of the theories of DSS and the GAL regarding the best interests of the children. Mother could have subpoenaed witnesses to come and testify regarding these reports in the disposition hearing, but failed to do so.
 

 Because the trial court applied the same evidentiary standards to all parties and because Mother had the right to participate and present relevant evidence at the disposition hearing, we reject Mother's argument.
 

 II. Best Interest Determination
 

 Finally, Mother contends that the trial court abused its discretion by determining that termination of her parental rights was in the best interests of the children. Specifically, Mother challenges Dispositional Findings of Fact
 
 [2]
 
 Numbers 4, 5, 6, 7, and 8 as not supported by competent evidence, and challenges the court's conclusion that termination was in the best interests of the children. For the reasons discussed below, we conclude that each of the challenged findings of fact were supported by competent and sufficient evidence introduced during the termination proceeding, and that the trial court's conclusion was supported by its findings of fact.
 

 *565
 
 "We review the trial court's conclusion that a termination of parental rights would be in the best interest of the child on an abuse of discretion standard."
 
 In re R.B.B.
 
 ,
 
 187 N.C.App. 639
 
 , 648,
 
 654 S.E.2d 514
 
 , 521 (2007).
 

 A.
 
 Challenged Findings
 

 Mother challenges Dispositional Finding of Fact 4, which reads: "[Andrew] loves his mother, but is wary of her anger. He does not mention her, or ask about her present circumstances. [Clark] shows affection towards his mother during visits, but parts from her without distress." Dearing, Andrew's social worker, testified that Andrew "definitely loves his mother very much, ... it's you know, apparent ... in his conversations with her on the phone from what I've heard. I've not participated in those. ... [B]ut he, you know, definitely is receptive to talking to her." However, Dearing also testified that "in conversations with [Andrew's] previous therapist and his present therapist, he does have some concerns about her anger. ... [A]nd you know, whether or not she would still be angry with him if he returned home." Furthermore, Dearing testified that "other than the phone calls, [Andrew] does not really talk about [Mother]." Dearing testified that Clark "does have a bond with his mother as well. ... [H]e is affectionate towards her ... usually when he comes in for visits, although does want to ... end the visit at certain times, ... he, you know, responds to her attention ... but then is just as willing to leave [ ] when the visit is over." This evidence was competent and sufficient to support the challenged finding.
 

 Mother also challenges Dispositional Finding of Fact 5, which reads: "[t]he permanent plan is adoption. Mother declined to relinquish. Termination of parental rights will promote the prompt achievement of the plan for permanence." During the adjudication hearing, at DSS's request, the trial court took judicial notice of the decretal portions of each review hearing, including the oral order entered 17 March 2015, memorialized to writing 8 June 2015. In that Permanency Planning Review Order, the trial court changed the permanent plan of care for the children to adoption, with an alternative plan of guardianship with a court-appointed caretaker. At the disposition hearing, Dearing testified that if Andrew becomes "legally free" for adoption, there will be "a lot more" available placement options for him. The trial court
 
 *880
 
 noted that termination of Mother's parental rights will "aid in the accomplishment of a permanent plan for [Andrew] ... now that he has blossomed relatively speaking ... so that he can be in a stable home ... and search for that home[.]" This evidence was competent and sufficient to support the challenged finding.
 
 *566
 
 Mother also challenges Dispositional Finding of Fact 6, which reads: "[t]he likelihood of adoption for [Andrew] is good. His present foster parents do not wish to adopt. [Andrew] is already listed on a 'legal risk placement' website, but legal clearance will enable the social worker to reach out to far more candidates to provide [Andrew] with a permanent home." Dearing testified that, in the past school year, Andrew had transitioned to "more mainstream classes" and "was able to pass all of his classes this past quarter," with the exception of one "D." Dearing testified that Andrew is "doing well with the foster parents," has shown a decrease in self-injurious behavior, "is very likeable," and is "very adaptable to [ ] our family unit." Dearing further testified that "while he does have the diagnosis of autism [,] he is very high functioning ... and would be considered adoptable." Dearing testified that Andrew's "current caretakers have stated that they are not interested in adopting him, not because they don't care for him but just because they [ ] don't want to have the commitment of adopting any child. It's not just [Andrew] specifically." This evidence was competent and sufficient to support the challenged finding.
 

 Mother challenges Dispositional Finding of Fact 7, which reads: "[t]he likelihood of adoption for [Clark] is high, because his present foster family wants to adopt him, and has demonstrated strong ability to meet his needs." Dearing testified that Clark's foster family has "stated very strongly that they want to adopt him." Dearing testified that Clark "has certainly shown a lot more progress in this home than he has in any of the placements that he has been in previously[,]" noting that his speech and behavior had both improved. Dearing further testified that Clark's foster mother has worked with children with autism for over twenty years and "has a great deal of ... experience in the field of working with children and adults with autism." This evidence was competent and sufficient to support the challenged finding.
 

 Finally, Mother challenges Dispositional Finding of Fact 8, which reads: "[t]here are no present viable candidates for guardianship or custody, and adoption is far more likely than either of those to result in true permanence and repose for these children." Dearing testified that "in order to give the children permanence, [ ] given [Mother's] difficulty interacting with foster placements in the past, there is not really [ ] a possibility that there would be a stable placement that either child could go to." Dearing testified that "in order to have a permanent placement for either child, the parental rights would need to be terminated." This evidence was competent and sufficient to support the challenged finding.
 

 *567
 
 B. "
 
 Best Interest" Factors
 

 Mother contends that the termination order did not adequately consider three of the six factors a trial court is instructed to consider in making its best interest determination. In determining the issue of best interest, N.C. Gen. Stat. § 7B-1110(a) directs the trial court to consider and make written findings regarding the following relevant criteria:
 

 (1) The age of the juvenile.
 

 (2) The likelihood of adoption of the juvenile.
 

 (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
 

 (4) The bond between the juvenile and the parent.
 

 (5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
 

 (6) Any relevant consideration.
 

 Mother argues the trial court did not consider "the likelihood of adoption," "whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile," and "the bond between the juvenile and the parent." Because the record
 
 *881
 
 reflects that the trial court considered evidence as to each relevant ground listed in N.C. Gen. Stat. § 7B-1110(a) and made adequate findings, we disagree with Mother's contention.
 

 The trial court's dispositional findings demonstrate that the court considered the relevant criteria in determining that termination was in the best interests of Andrew and Clark. Specifically, as discussed
 
 supra
 
 , the trial court made findings, supported by competent evidence, concerning the likelihood of adoption for Andrew and Clark, concerning whether termination of Mother's parental rights would aid in the accomplishment of the permanent plan of adoption, and concerning the bond between Mother and each of the children.
 

 Mother contends that the trial court abused its discretion in concluding that termination of her parental rights was in the best interest of Andrew because "[r]ealistically[,] Andrew was not going to be adopted by anyone." Mother argues that Andrew's situation is comparable to the juvenile in
 
 In re J.A.O.
 
 ,
 
 166 N.C.App. 222
 
 , 227-28,
 
 601 S.E.2d 226
 
 , 230 (2004).
 

 *568
 
 In
 
 J.A.O.
 
 , this Court held that the trial court abused its discretion in determining that termination of the mother's parental rights was in the best interest of the juvenile, where the GAL "argued at trial[ that] it is highly unlikely that a child of [the juvenile's] age and physical and mental condition would be a candidate for adoption, much less selected by an adoptive family."
 

 Id.
 

 at 228
 
 ,
 
 601 S.E.2d at 230
 
 . This Court recognized that a small possibility of the juvenile's adoption remained, but, held, "we are unconvinced that the remote chance of adoption in this case justifies the momentous step of terminating respondent's parental rights."
 

 Id.
 

 This case is distinguishable from
 
 J.A.O.
 
 Dearing testified that "while [Andrew] does have the diagnosis of autism [,] he is very functioning" and "would be considered adoptable." Furthermore, Dearing testified that if Andrew were to become "legally free,"
 
 i.e.
 
 , if Mother's rights were terminated, there will be a "lot more ... options available for him." This testimony provided competent evidence to support the trial court's finding that "[t]he likelihood of adoption for [Andrew] is good." Moreover, this Court has held that "the absence of an adoptive placement for a juvenile at the time of the termination hearing is not a bar to terminating parental rights."
 
 In re D.H.
 
 ,
 
 232 N.C.App. 217
 
 , 223,
 
 753 S.E.2d 732
 
 , 736 (2014) (citation omitted). Therefore, we reject Mother's argument that the trial court did not adequately consider the adoptability of Andrew.
 

 Mother also contends that the trial court did not adequately consider her bond with her children. Specifically, Mother argues that "[b]oth children had great relationships with their mother."
 

 In determining the best interests of the children, in addition to the evidence presented at the disposition hearing and previously addressed
 
 supra
 
 , the trial court also considered evidence from the adjudication hearing. The trial court made the following pertinent findings of fact based on the evidence presented at the adjudication hearing:
 

 30. ... Mother's visits were transferred from her home to the observation room at DSS after an October 23, 2015 incident in which [M]other admitted to dragging [Clark] to his time-out spot during a tantrum. ...
 

 31. ... [Mother] once told [Andrew] it was his fault he was in foster care. These things were upsetting to [Andrew], who had a long-standing pattern of excessive self-blaming and self-harm, known to his mother.
 

 ...
 

 *569
 
 33. ... In his individual therapy, [Andrew] had shared memories of incidents in his mother's home that were painful to him, such as his being locked out of his home at night, or occasions in which [Mother] allowed [Andrew's] older brother [ ] to give [Andrew] "whoopings" for bad behavior. When these issues were raised in family therapy, [Mother] was defensive and dismissive, and refused to validate the child's memories or feelings, to the child's detriment.
 

 These findings are unchallenged by Mother on appeal. "Unchallenged findings of fact are binding on appeal."
 

 *882
 

 Peters v. Pennington
 
 ,
 
 210 N.C.App. 1
 
 , 13,
 
 707 S.E.2d 724
 
 , 733 (2011) (citation omitted).
 

 As support for Mother's contention that the trial court did not adequately consider her bond with her children, Mother points to evidence tending to show that Andrew wanted to live with his mother, that Mother attempted to visit and contact her children often, and that Mother was committed to the care and needs of her children. Mother's argument, however, disregards the well-established principle that "[f]indings of fact supported by competent evidence are binding on appeal, despite evidence in the record that might support a contrary finding."
 
 In re C.I.M.
 
 ,
 
 214 N.C.App. 342
 
 , 345,
 
 715 S.E.2d 247
 
 , 250 (2011). Here, the trial court made ample findings of fact regarding the bond between Mother and her children.
 

 Mother has failed to show that the court's decision that the termination of her parental rights as being in the best interests of Andrew and Clark was "so arbitrary that it could not have been the result of a reasoned decision."
 
 Hennis
 
 ,
 
 323 N.C. at 285
 
 ,
 
 372 S.E.2d at 527
 
 . Accordingly, we hold that the trial court made the requisite findings under N.C. Gen. Stat. § 7B-1110(a) and these findings reveal a reasoned decision within the court's discretion.
 

 III. Conclusion
 

 We hold that the trial court did not improperly restrict Mother's right to present evidence at the disposition hearing. Additionally, we hold that the trial court made the necessary and relevant findings in determining that termination of her parental rights was in the best interests of Andrew and Clark. Accordingly, the trial court did not abuse its discretion and we affirm the decision of the trial court.
 

 AFFIRMED.
 

 Judges DAVIS and ENOCHS concur.
 

 [1]
 

 We use the pseudonyms adopted by the parties to protect the juveniles' identities.
 

 [2]
 

 Mother's brief mistakenly refers to these dispositional findings as conclusions of law.